RIOS *v.* UNITED STATES.

No. 52.  Argued March 29, 1960.—
Decided June 27, 1960.

*Harvey M. Grossman* argued the cause for petitioner. With him on the brief was *Clore Warne*.

*Assistant Attorney General Wilkey* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Beatrice Rosenberg* and *Eugene L. Grimm*.

*A. L. Wirin* filed a brief for the American Civil Liberties Union et al., as *amici curiae*, urging reversal.

MR. JUSTICE STEWART delivered the opinion of the Court.

An indictment filed in the United States District Court for the Southern District of California charged the petitioner with unlawful receipt and concealment of narcotics in violation of 21 U. S. C. § 174. Before trial the petitioner made a motion to suppress for use as evidence a package of heroin which, so a California court had found, Los Angeles police officers had obtained from the petitioner in an unconstitutional search and seizure. After a hearing the District Court denied the motion to suppress, finding that federal agents had not participated in the search, and finding also that the California officers had obtained the evidence in a lawful manner. The package of narcotics was admitted in evidence over the petitioner's renewed objection at his subsequent trial. He was convicted and sentenced to twenty years in prison.

The Court of Appeals affirmed the conviction, accepting the District Court's finding that the seizure had been lawful, and holding that in any event illegally seized evidence "may nevertheless be received in a federal prosecution, if the seizure was made without the participation of federal officials." 256 F. 2d 173, at 176. Certiorari was granted in an order which limited the questions for consideration to two, 359 U. S. 965:

> "1. Independently of the state court's determination, was the evidence used against petitioner in the federal prosecution obtained in violation of his rights under the Constitution of the United States?
>
> "2. If the evidence was unlawfully obtained, was such evidence admissible in the federal prosecution of petitioner because it was obtained by state officers without federal participation?"

In *Elkins* v. *United States,* decided today, *ante,* p. 206, the Court has answered the second question by holding that evidence seized in an unreasonable search by state officers is to be excluded from a federal criminal trial upon the timely objection of a defendant who has standing to complain. The only question that remains in this case, therefore, is whether the Los Angeles officers obtained the package of heroin "during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment." *Ante,* p. 223. As in most cases involving a claimed unconstitutional search and seizure, resolution of the question requires a particularized evaluation of the conduct of the officers involved. See *Go-Bart Co.* v. *United States,* 282 U. S. 344, 357.

At about ten o'clock on the night of February 18, 1957, two Los Angeles police officers, dressed in plain clothes and riding in an unmarked car, observed a taxicab stand-

ing in a parking lot next to an apartment house at the corner of First and Flower Streets in Los Angeles. The neighborhood had a reputation for "narcotics activity." The officers saw the petitioner look up and down the street, walk across the lot, and get into the cab. Neither officer had ever before seen the petitioner, and neither of them had any idea of his identity. Except for the reputation of the neighborhood, neither officer had received information of any kind to suggest that someone might be engaged in criminal activity at that time and place. They were not searching for a participant in any previous crime. They were in possession of no arrest or search warrants.

The taxicab drove away, and the officers followed it in their car for a distance of about two miles through the city. At the intersection of First and State Streets the cab stopped for a traffic light. The two officers alighted from their car and approached on foot to opposite sides of the cab. One of the officers identified himself as a policeman. In the next minute there occurred a rapid succession of events. The cab door was opened; the petitioner dropped a recognizable package of narcotics to the floor of the vehicle; one of the officers grabbed the petitioner as he alighted from the cab; the other officer retrieved the package; and the first officer drew his revolver.[1]

The precise chronology of all that happened is not clear in the record. In their original arrest report the police stated that the petitioner dropped the package only after one of the officers had opened the cab door. In testifying later, this officer said that he saw the defendant drop the package before the door of the cab was opened. The taxi

---

[1] The petitioner later broke free from the policeman's grasp and ran into an alley. There the officer apprehended him after shooting him in the back.

driver gave a substantially different version of what occurred. He stated that one of the officers drew his revolver and "took hold of the defendant's arm while he was still in the cab." [2]

---

[2] "Q. Will you just tell us in your own words, Mr. Smith, what happened immediately after the time you saw Officer Beckmann?

"A. Well, he appeared alongside my taxicab on the right-hand side opposite the front window on the right holding a flashlight in his right hand, I believe, and his billfold in his left. . . .

"The Court: Then what happened?

"The Witness: Then I believe he turned toward the defendant who was riding in the back of the cab and I think he motioned with his billfold toward the defendant and he opened the door. Now somewhere along in here I think Beckmann disposed of his flashlight. I didn't notice exactly what happened there.

"By Mrs. Bulgrin:

"Q. What did the defendant do? What was happening as far as the defendant was concerned?

"A. Well, he appeared to be becoming quite agitated.

"Q. While he was inside the cab?

"A. While he was inside the cab, yes.

"Q. When the door opened did he get out?

"A. Well, there are other events before he got out.

"The Court: What were they?

"The Witness: Well, I am trying to get these in the right order. It is difficult because things happened quickly. . . .

"The Witness: Officer Beckmann opened the door and I asked him who he was, that is, he opened the rear door of the taxicab and he said, 'We are police officers.' I just wanted to satisfy my own mind about that. I didn't know whether he was a policeman or a hijacker positively, but I thought that he was a policeman but I wanted to be sure. So he said, 'We are police officers.'

"I thought probably it was just a routine examination. I work the night shift, have for some time, and I have been stopped by the police and they have checked the occupants of my cab. There have been quite a few holdups of taxi drivers and I just thought it was a routine thing.

"But the defendant was getting quite agitated and I noticed at this time that Officer Beckmann had his revolver drawn, which seemed to me somewhat extraordinary just to stop and question an occupant of a cab, and said something to the effect that you are scaring him,

A state criminal prosecution was instituted against the petitioner, charging him with possession of narcotics, a felony under California law. Cal. Health and Safety Code, § 11500. At a preliminary hearing the two Los Angeles officers testified as to the circumstances surrounding the arrest and seizure. When the case came on for trial in the Superior Court of Los Angeles County, the petitioner moved to suppress as evidence the package of heroin which the police had seized. On the basis of the transcript of the preliminary hearing, and after brief argument by counsel, the court granted the motion and entered a judgment of acquittal.[3]

---

what is the big idea, something like that. I don't remember my exact words.

"As I recall then Officer Beckmann took the defendant by the arm—

"By Mrs. Bulgrin:

"Q. That was after the defendant got out of the cab, is that correct?

"A. It was my impression that Officer Beckmann took hold of the defendant's arm while he was still in·the cab. . . .

"The Court: How could you tell the defendant was agitated?

"The Witness: Well, it is a rough impression but I was sufficiently impressed with the fact at the time to protest to Officer Beckmann that he was frightening him, and as far as I knew there was no good cause to be frightening him with a drawn revolver. Maybe it was me who was agitated."

On cross-examination the taxi driver testified as follows:

"Well, I would say that the most prominent thing in my eyesight at the time was this revolver, which looked the size of a cannon. . . .

"At the time he opened the door, I can't say just at what point in the order of these events he drew his revolver, but at some time before or after the door was opened, while Rios was still sitting in the cab, he drew his revolver."

[3] California follows the so-called exclusionary rule. *People* v. *Cahan*, 44 Cal. 2d 434, 282 P. 2d 905. The basis for the trial court's suppression of the evidence is revealed in the following excerpt from the judge's brief oral opinion:

"As I see it, I can't possibly see how this arrest could have originally

Thereafter, one of the Los Angeles officers who had arrested the petitioner discussed the case with his superiors and suggested giving the evidence to United States authorities. He then got in touch with federal narcotics agents and told them about the petitioner's case. This led to the federal prosecution we now review.[4]

---

been attempted under the information the officer very frankly tells us that he had. I don't think any reasonable man would think a felony had been committed because a man comes out of a building, looks up the street, and the other way on the street, then looks up First Street, then walks to an automobile in a parking lot, gets in a taxicab and drives away. What in the world there is in that, together with the fact it happens to be First and Hope or First and Flower—I forget which it is—and also that somebody else was arrested in a taxicab, when there are so many hundreds of taxicabs in this community, about three months before, just to state it shows the absurdity of it, insofar as I see, and your motion to suppress the evidence will be granted—. . .

"I find him not guilty as charged. They will get you sometime, Rios; they didn't get you this time but they will sometime."

[4] "Q. What occasioned the presentation of this case to the Federal grand jury after the ruling in the Superior Court across the street, Mr. Beckmann, in this particular case?

"A. After the ruling in the Superior Court, approximately a week or two weeks later, I conferred with my divisional commander, Captain Clavis, about the case, and at that time I showed him the arrest reports and discussed the case with him.

"He then called Captain Madden of the Narcotics Division of the Los Angeles Police Department. I then went over and talked to Captain Madden of the Los Angeles Police Department. Captain Madden then looked at the arrest report, and I discussed the case with him going to the Federal Narcotics to present the case.

"Q. Whose idea was that? Was that yours or Captain Madden's?

"A. Mine.

"Q. In other words, did you institute the discussion with Captain Madden?

"A. Yes. Captain Madden then called Federal Narcotics and I went over to Federal Narcotics and talked to Mr. Goven. At that time I showed him a copy of my arrest report and discussed the case with him."

In holding that the package of heroin which had been seized by the state officers was admissible as evidence in the federal trial, the District Court placed prime reliance upon the silver platter doctrine, there having been no participation by federal agents in the search and seizure. But the court also expressed the opinion, based upon the transcript of the state court proceedings and additional testimony of the two Los Angeles police officers at the hearing on the motion to suppress, that the officers had obtained the evidence lawfully. The court was of the view that the seizure was permissible as an incident to a legal arrest, or, alternatively, that the petitioner had abandoned the narcotics when he dropped them to the floor of the taxicab. At the time this opinion was expressed, however, the district judge had not yet heard the taxicab driver's version of the circumstances surrounding the arrest and seizure. The driver did not testify until the trial itself. After he had testified, the package of heroin was offered in evidence. The petitioner's counsel objected, and the court overruled the objection without comment. See *Gouled* v. *United States,* 255 U. S. 298, 312–313; *Amos* v. *United States,* 255 U. S. 313, 316–317; *Jones* v. *United States,* 362 U. S. 257, 264. For all that appears, this ruling may then have been based solely upon the silver platter doctrine. Moreover, the Court of Appeals gave no consideration to the question of the legality of the state search and seizure, relying as it did upon the silver platter doctrine and rejecting the petitioner's contention that the state court's determination of illegality precluded the federal trial court from making an independent inquiry into the matter.

With the case in such a posture, we have concluded that the interests of justice will best be served by remanding the case to the District Court. There, free from the entanglement of other issues that have now become irrel-

evant, the lawfulness of the policemen's conduct can be determined in accord with the basic principles governing the validity of searches and seizures by federal officers under the Fourth Amendment.

Under these principles the inquiry in the present case will be narrowly oriented. The seizure can survive constitutional inhibition only upon a showing that the surrounding facts brought it within one of the exceptions to the rule that a search must rest upon a search warrant. *Jones* v. *United States,* 357 U. S. 493, 499; *United States* v. *Jeffers,* 342 U. S. 48, 51. Here justification is primarily sought upon the claim that the search was an incident to a lawful arrest. Yet upon no possible view of the circumstances revealed in the testimony of the Los Angeles officers could it be said that there existed probable cause for an arrest at the time the officers decided to alight from their car and approach the taxi in which the petitioner was riding. Compare *Brinegar* v. *United States,* 338 U. S. 160; *Carroll* v. *United States,* 267 U. S. 132; *Henry* v. *United States,* 361 U. S. 98. This the Government concedes.[5]

If, therefore, the arrest occurred when the officers took their positions at the doors of the taxicab, then nothing

---

[5] At the time of the arrest the California statute governing arrest without warrant provided as follows:

"A peace officer may make an arrest in obedience to a warrant delivered to him, or may, without a warrant, arrest a person:

"1. For a public offense committed or attempted in his presence.

"2. When a person arrested has committed a felony, although not in his presence.

"3. When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it.

"4. On a charge made, upon a reasonable cause, of the commission of a felony by the party arrested.

"5. At night, when there is reasonable cause to believe that he has committed a felony." Cal. Penal Code (1956 ed.), § 836 (later amended, Stat. 1957, c. 2147, § 2).

that happened thereafter could make that arrest lawful, or justify a search as its incident. *United States* v. *Di Re,* 332 U. S. 581; *Johnson* v. *United States,* 333 U. S. 10; *Miller* v. *United States,* 357 U. S. 301; *Henry* v. *United States,* 361 U. S. 98. But the Government argues that the policemen approached the standing taxi only for the purpose of routine interrogation, and that they had no intent to detain the petitioner beyond the momentary requirements of such a mission. If the petitioner thereafter voluntarily revealed the package of narcotics to the officers' view, a lawful arrest could then have been supported by their reasonable cause to believe that a felony was being committed in their presence.[6] The validity of the search thus turns upon the narrow question of when the arrest occurred, and the answer to that question depends upon an evaluation of the conflicting testimony of those who were there that night.

The judgment is vacated, and the case is remanded to the District Court for further proceedings consistent with this opinion.

*Vacated and remanded.*

[For opinion of MR. JUSTICE FRANKFURTER, joined by MR. JUSTICE CLARK, MR. JUSTICE HARLAN and MR. JUSTICE WHITTAKER, see *ante,* p. 233.]

[For memorandum of MR. JUSTICE HARLAN, joined by MR. JUSTICE CLARK and MR. JUSTICE WHITTAKER, see *ante,* p. 251.]

---

[6] A passenger who lets a package drop to the floor of the taxicab in which he is riding can hardly be said to have "abandoned" it. An occupied taxicab is not to be compared to an open field, *Hester* v. *United States,* 265 U. S. 57, or a vacated hotel room, *Abel* v. *United States,* 362 U. S. 217.