**UNITED STATES of America**
**v.**
**Robert BRETT and Mary Garcia Cruz.**
**Crim. No. 65-L-275.**

United States District Court
S. D. Texas,
Laredo Division.
May 31, 1966.

Morton L. Susman, U. S. Atty., and Ronald J. Blask, Asst. U. S. Atty., Houston, Tex., for the United States.

Charles A. Tucker, Houston, Tex., for the defendant.

MEMORANDUM:

CONNALLY, Chief Judge.

The defendants herein, Robert Brett and his mother, Mary Garcia Cruz, stand charged in a three-count indictment with certain violations of the narcotics laws of the United States with respect to some 50 grams of heroin. Count One charges unlawful importation of the narcotic drug and Count Two charges unlawful transportation and concealment, each in violation of § 174 of Title 21 U.S.C.A., while Count Three charges the unlawful purchase not in or from the original stamped package, in violation of § 4704 of Title 26 U.S.C.A.

The defendants filed a timely motion to suppress use of the narcotics as evidence, contending that the seizure resulted from an allegedly illegal search. They elected to waive a jury and to be tried to the Court. The motion to suppress was heard with the case, and disposition of the motion is decisive of the guilt or innocence of the two defendants. The motion raises the usual question of probable cause.

A proper understanding of the question requires a rather detailed account of the events preceding the seizure.

In the month of November 1965, Customs Agent Galanos was stationed at Falcon Heights, Texas, a small community on the banks of the Rio Grande River and thus just across the Rio Grande from the Republic of Mexico. It is located on State Highway 83, which roughly parallels the Rio Grande River and lies in close proximity thereto, beginning at Laredo, Texas and extending southeastward a distance of some 150 miles. This area is one of large ranches and few persons. The towns—and even habitations—are few and far apart. A visitor hears Spanish spoken as often as English.

At about 11:00 p. m. on the evening of November 18, 1965, Galanos was returning home from patrol via Highway 83. At a spot on the highway some 15 miles south of Falcon Heights, he observed a car proceeding at a very slow rate of speed. The vehicle made a U-turn and proceeded in the opposite direction. Making certain that his interest in the vehicle was not detected by the occupants thereof, Galanos continued to watch it. The vehicle thereupon made another U-turn (apparently to determine if it were being followed) and turned off of the highway onto the Fronton Road. This is a small, seldom-traveled road leading from the highway directly to a spot on the Rio Grande River a few miles away. At this point the Rio Grande is a shallow stream readily fordable on foot. A number of dealers in narcotics, well-known to the Customs Agents, reside and ply their trade in a small Mexican community opposite this point. To the Customs Agents, it is notorious as an area where narcotics are smuggled into the country. A number of seizures in the past were known by Galanos to have crossed at this spot.

Galanos did not follow the car down the Fronton Road for fear of detection, but waited upon the highway. Some 15 minutes thereafter it emerged, re-entered the highway and proceeded north. After proceeding at an inordinately slow speed for a period of time, the car ultimately resumed normal speed and proceeded to Laredo, Texas, arriving about 1:00 a. m. The occupants registered at a motel.

Galanos, meanwhile, by radio communication had requested the assistance of other agents in maintaining surveillance of the vehicle. From its license, he recognized it as one registered in Houston, Texas, a city distant some 350 miles. By prompt telephonic communication with Houston authorities, he learned that the car was registered in the name of the defendant Robert Brett, and that Brett was known to Houston authorities as a user or dealer in narcotics, with a prior narcotics conviction.

By this time the agents were convinced that Brett or the other occupants of the vehicle (ultimately shown to have been his mother and co-defendant; his wife, and infant child) had made the trip to acquire narcotics, but were uncertain as to whether delivery had been made on the Fronton Road, or whether —as frequently happens—arrangements had been made for later delivery, at a time when the purchasers had assured themselves that they were not under surveillance.

About 2:00 p. m. the following day, the party emerged from their motel rooms, and entered their vehicle preparatory to leaving Laredo. The agents converged upon the car, identified themselves, and "patted down" the defendant Brett in a search for weapons. None was found on his person, though a pistol was later found in the vehicle.

Brett was warned of his rights against self-incrimination. He was told by the officers that they knew who he was, and where he was from; and that they expected to make a careful search for the suspected contraband. Brett stated that he had what the officers were seeking, and asked to speak to his mother. Mrs. Cruz was summoned, and the two conversed in Spanish. Mrs. Cruz then expressed an immediate desire to visit a bathroom. The officers consented, but advised her that the water would be cut off (to prevent disposal of the contraband by obvious means). Thereupon Mrs. Cruz produced the package of heroin which had been concealed upon her person. Neither she nor her son had been searched at that time. Thereafter, both were placed under arrest.

It is the defendants' contention that the arrest took place when the officers first identified themselves and advised the parties that they expected to make a search. The purpose of such contention, of course, is to make it appear that the defendants were under arrest at the earliest moment, and before the contraband had been produced, for the officers had no warrant and had permitted the morning hours to pass without undertaking to secure one. Proceeding on the premise that the arrest had taken place at that time, and that it was illegal under the circumstances, it is further argued that the later discovery of the heroin does not lend validity or breathe vitality into an originally unlawful proceeding. Reliance is placed primarily on Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and similar authorities dealing with the entry of officers without a warrant into a private dwelling, and an arrest based on disclosures resulting therefrom.

■ Were the premise valid, the conclusion would follow, but defendants' contention disregards the well-recognized principle sustained by the highest authority that an officer in performance of his duties temporarily may detain and question a citizen without placing him under arrest; and that any incriminating evidence which comes to the officer's attention during such time may itself become the basis for effecting a valid arrest, and may be received in evidence against the accused. Rios v. United States (1960), 364 U.S. 253, at p. 262, 80 S.Ct. 1431, 4 L.Ed.2d 1688; Brinegar v. United States (1949) 338 U.S. 160 particularly concurring opinion of Mr. Justice Burton, p. 178, 69 S.Ct. 1302, 93 L. Ed. 1879; Busby v. United States, 296 F.2d 328 (9th Cir. 1961); Moore v. United States, 296 F.2d 519 (5th Cir. 1961); Thomas v. United States, 281 F.2d 132 (8th Cir. 1960); United States v. Bonanno, 180 F.Supp. 71, at p. 79 (S.D.N. Y.1960).

The right of Customs Agents to detain and search a vehicle or vessel, as well as the occupants thereof, suspected of concealing contraband has been extended to its constitutional limits by statute. Sec. 482 of Title 19 U.S.C.A., reads in pertinent part as follows:

"Any of the officers * * * may stop, search, and examine * * * any vehicle, beast, or person, on which or on whom he or they shall suspect

there is merchandise which is subject to duty, or which have been introduced into the United States in any manner contrary to law, * * * and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer * * * shall find any such merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, * * * he shall seize and secure the same for trial."

The history of similar legislation designed to protect the United States in the collection of its customs duties and to prevent the illicit traffic in contraband is reviewed, and the validity of such statutes sustained, in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790 (1925).

■ Of course, where a vehicle is stopped for search, the impact is felt upon the occupants. Their progress is halted. They are not, for the moment, free to leave. Inevitably some conversation must take place between the officers and the occupants. Here, the detention and conversation took no more than a few moments; the conduct of the officers was unexceptional; no force was used to restrain the defendants. The defendants were not under arrest until they were so advised by the officers, which was after the narcotics had been produced.

■ Thus to support the introduction into evidence of the heroin, it is not necessary that the officers have had the right to arrest when they first approached the vehicle. The right to search is not dependent thereon. "The right to search and the validity of the seizure are not dependent upon the right to arrest. They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law." *Carroll,* supra, at p. 158, 45 S.Ct. at p. 287. Thus the question is reached as to whether Galanos had before him facts

and circumstances within his knowledge sufficient in themselves to warrant a man of reasonable caution in the belief that an offense had been or was being committed. Carroll v. United States, supra; Brinegar v. United States, supra; Romero v. United States, 318 F.2d 530 (5th Cir. 1963); Vaccaro v. United States, 296 F.2d 500 (5th Cir. 1961), cert. den. 369 U.S. 890, 82 S.Ct. 1164, 8 L.Ed.2d 289; Contreras v. United States, 291 F.2d 63 (9th Cir. 1961); Flores v. United States, 234 F.2d 604 (5th Cir. 1956).

A review of the circumstances set out in the opening paragraphs hereof leads to the inescapable conclusion that Galanos knew to a moral certainty that these defendants had made the trip for the acquisition of narcotics. For what legitimate purpose would a known narcotic violator drive slowly back and forth along a remote section of Highway 83 at midnight? Why would he abandon the highway and drive to the very banks of the Rio Grande? On returning to the highway, why would he continue at a snail's pace, before resuming normal speed as he approached the first town? It was not to seek lodging or gasoline, for none was available on the Fronton Road. To one knowledgeable in the ways of the violator, there could be but a single answer.

Comparing the instant case with *Carroll* and *Brinegar* supra, the leading authorities on probable cause to stop and search a vehicle suspected of containing contraband, how much stronger are the circumstances here. In each of those cases decided on surprisingly similar facts, the officers knew that the defendant was engaged in the bootlegging business; and recognizing the defendant and his vehicle, proceeding from an area known to be a prolific source of supply of bootleg whiskey to an area known to be one with a consuming thirst, the officers stopped the vehicle for the purpose of search. In each instance the whiskey was found, and the search upheld. It should be borne in mind that in each of these cases the defendant was proceed-

ing on a well-traveled highway, between metropolitan areas, during daylight hours. While known to be coming from the cities of Detroit, Michigan, and from Joplin, Missouri, respectively, the defendants there were not known to have come directly from a definite spot on the United States border known as a landing point of contraband, as was the case here. Save for the suggestion that the cars appeared to be "heavily loaded", there was nothing to indicate to the officers in *Carroll* and *Brinegar* that, at the particular moment, the defendants in fact were carrying whiskey.

I am of the view, and hold, that Galanos had within his knowledge facts and circumstances sufficient to warrant him in believing that illegal narcotics were being transported in the automobile as the defendants resumed their trip on the afternoon of November 19, 1965. He and the other officers were justified in stopping the vehicle for the search, and in detaining and questioning the occupants incident thereto. When the defendant Brett admitted his guilt, and when Mrs. Cruz produced the narcotic from her person, there was ample basis to effect the arrest. The action of this officer shows ingenuity and dedication. It brought about the seizure of a large commercial quantity of heroin, and did so without prejudice to the constitutional rights of these defendants. The motion to suppress is denied.

Circumstances indicate that in all probability the defendants acquired the narcotic on the American side of the river. There is no direct evidence that they imported it into the United States, and I find the statutory presumption insufficient basis to support a conviction. Each of the defendants is acquitted on Count One. I find each to be guilty—as undoubtedly they are—of concealing and facilitating the transportation and concealment, etc., as charged in Count Two and with having made the purchase not in or from the original stamped package as charged in Count Three.