**UNITED STATES of America,**
v.
**Ralph Thomas COPELAND, Defendant.**
**No. 66 Cr. 633.**

United States District Court
S. D. New York.
Jan. 25, 1967.

Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, by David A. Luttinger, Asst. U. S. Atty., for the United States.

Edmund Allen Rosner, New York City, for defendant.

## OPINION

TYLER, District Judge.

Ralph Thomas Copeland, who was arrested as an alleged violator of the narcotics laws at Eighth Avenue and 113th Street in Manhattan on November 30, 1965, moves, pursuant to F.R.Cr.P. 41(e), to suppress certain evidence found in a brown paper bag by two federal narcotics agents at the time of the defendant's apprehension. Hearings were held on this motion on November 22, November 25, and November 28, 1966. On the basis of the testimony adduced at those proceedings, it is determined that the motion should be, and hereby is, denied.

A principal issue to be resolved is one of credibility. The hearing produced a direct conflict in the testimony of Richard Slattery, an agent of the Federal Narcotics Bureau, and Rhonda Emanuel, a witness produced in behalf of the defendant. Such a resolution will yield the findings of fact which can be used as a basis for a discussion of the legality of the seizure of the evidence in question.

The events which occurred prior to the arrival of the defendant and the two agents in the vicinity of Eighth Avenue and 113th Street are uncontradicted.[1] Agent Slattery and his partner Agent Antonelli had been conducting an investigation for approximately three weeks prior to the evening in question, November 30, 1965. The subjects of that investigation were individuals known to the agents as Sinclair Small, Leroy Logan, and a "John Doe" known only as "Jake". On the evening of November 30, at around 7:20 p. m., Small and Logan left the former's apartment house and entered Small's car. After one stop, Small, who was driving, got out of the car at Concourse Village East and 158th Street. Logan took the wheel and proceeded to Fifth Avenue, between 115th and 116th Streets where he stopped, got out of the car, crossed the street and met "Jake". The two walked into the hallway of a nearby building and momentarily disappeared.

When they reappeared, they separated. The agents decided to concentrate on surveillance of "Jake". The time was 8:00 p. m. About ten minutes later, the defendant, whom the agents had never seen before, drove up in a tan 1966 Dodge Dart. He left his car, crossed the street, and met Jake. Jake in turn walked into a hallway, returned, and "appeared" to hand Copeland "something". The defendant returned to his auto and proceeded to Lenox Avenue and 116th Street

---

1. The following recital of facts, until otherwise indicated, is based entirely upon testimony given by Agent Slattery.

where he stopped and picked up a passenger, subsequently identified as Ralph Stanley Morgan. The defendant then proceeded to the vicinity of the intersection of Eighth Avenue and 113th Street.

Shortly thereafter, Rhonda Emanuel first saw the defendant on the evening in question. Beginning at this point, therefore, the conflicting observations of the agent and the defendant's witness must be summarized.

According to Agent Slattery's testimony, Copeland, proceeding west, stopped and parked his car on the north side of 113th Street, approximately one hundred feet west of the intersection of Eighth Avenue and 113th Street. The agents stopped their vehicle on the south side of 113th Street, just east of the aforementioned intersection. Copeland left his car and entered the Hideout Bar, located on the northwest corner of Eighth Avenue and 113th Street.

Five minutes later, the defendant left the Hideout Bar and began walking toward his parked car. At this time, Agent Slattery started his vehicle, crossed the intersection and proceeded to a point on the north side of 113th Street approximately two or three car lengths in front of the defendant's vehicle. During this interval, Copeland reached and reentered his car.

Agent Slattery double-parked. He and his partner left their car and began walking back to the defendant's automobile, without showing any identification or weapon or saying anything to the defendant or his passenger. Agent Slattery walked in the street and Agent Antonelli on the sidewalk. Agent Slattery did not testify as to what he and his partner intended to do when they reached the car.

When the two reached the front of Copeland's car, Agent Slattery saw the defendant drop a brown paper bag out of the open right front window of the car. The bag dropped to the street and

landed approximately under the vehicle's door panel. Agent Slattery stooped, picked up the bag and opened it. The contents appeared to him to be "half-loads" of heroin. Slattery signaled his discovery to Agent Antonelli, and a formal arrest of the defendant was immediately effected.

Rhonda Emanuel took the stand as a witness for the defendant and told a substantially different story, which is summarized below.

Miss Emanuel first saw the defendant, a casual friend of hers, on the evening of November 30, 1965, at about 8:45 p. m. in the Hideout Bar. After about a five-minute stay, Copeland left the bar. Miss Emanuel also left, by coincidence rather than by design. When the defendant reached his car [2] and placed his hand on the door handle, four or five men approached him,[3] pushed him up against the car and conducted a search of his person, which yielded nothing. The men then put the defendant "on the side", opened the car door and "went into the car", in which they found, on the front seat, an ordinary brown paper bag which they removed from the car. During this time, the defendant never reentered his car.

■ In my view, the credible version was that related by Agent Slattery. In every important aspect, his testimony was given in the logical and careful manner which is reflective of an eye and mind trained to observe and record detail accurately. On the other hand, Miss Emanuel's testimony could be characterized as vague and inconsistent in several instances, two of which are pointed out, supra.[4]

■ I am not, of course, required to base a determination on credibility solely upon the contents of testimony; rather, as trier of the facts in this case, I "may, and indeed [I] should, take into consideration the whole nexus of sense impres-

2. It is not clear from Miss Emanuel's testimony whether the car was parked on Eighth Avenue or 113th Street (SM 44, 45, 46 and 61).

3. Miss Emanuel was not sure of the direction from which the agents approached the car. (SM 45, 46).

4. See footnotes 2 and 3, supra.

sions which [I] get from a witness." Dyer v. MacDougall, 201 F.2d 265, 269 (2d Cir. 1952).

Evaluation of the witnesses in this broader context reinforces my earlier conclusion that the testimony of Agent Slattery should be accepted as credible wherever it conflicts with that of Miss Emanuel. Specifically, I take this view because of considerations relating to appearance, manner and demeanor of the witnesses which manifested their relative frankness and intelligence, and, as already indicated, the apparent greater capacity of the agent to record and relate sense impressions accurately. Compare United States v. Campos, 255 F.Supp. 853, 855–56 (S.D.N.Y.1966), aff'd, 362 F.2d 1011 (2d Cir. 1966), cert. denied, 385 U.S. 842, 87 S.Ct. 95, 17 L.Ed.2d 75 (1966).

Within the framework of the facts developed by Agent Slattery, the ultimate inquiry is whether the evidence in question was obtained legally by the Narcotics Bureau agents. Essentially, the government maintains that the evidence was "abandoned" by the defendant when he dropped the brown paper bag out of the window of the car before any arrest was made so that there is no question of an illegal seizure. The defendant maintains the following: for constitutional purposes, an "arrest" without a warrant and without probable cause was made before the bag was dropped out of the window; thus, the bag was abandoned as a result of an illegal arrest and, as such, is inadmissible as evidence.

The government does not contend that the agents had any warrant of arrest or, indeed, that the agents had any probable cause to arrest the defendant. Thus, the issue, as specifically framed, is whether or not the agents effected an arrest of the defendant when, without stopping the defendant's car, they approached the vehicle from the front, one agent walking on the sidewalk and the other in the street, without showing any identification or weapon, without saying anything to the defendant and without physically restraining the defendant from leaving his car in any way.

■ It has been ruled that "[t]o constitute an arrest, there must be an actual or constructive seizure or detention of the person, performed with the intention to effect an arrest and so understood by the person detained." Jenkins v. United States, 161 F.2d 99, 101 (10th Cir. 1947). The record before me is silent as to the intention of the agents as they approached the car or the understanding of the defendant as he watched the agents approach. This silence does not preclude a determination here, however, for the facts lead me to hold, as a matter of law, that there was no actual or constructive seizure or detention of the defendant at the time the brown paper bag was dropped out of the window.

The defendant contends that he was detained because the agents approached his car from the front, thus preventing him from moving the vehicle without running down one of the officers. This line of reasoning has no merit.[5]

In Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), relied on by defendant, the Supreme Court held that the arrest involved therein took place when the federal agents waved to a stop the car in which the defendants were riding. 361 U.S. at 99 and 103, 80 S.Ct. 168. The importance of the court's determination of the exact time of arrest is not clear since the government apparently planned to concentrate upon this issue in the case of Rios v. United States, which was pending before the court at the time;[6] moreover, in the instant case, the

---

5. A logical extension of this theory would be that there would have been no restraint if the officers had approached from the rear. Creation of the condition of restraint should not depend on such fortuitous circumstances; furthermore, it would be unrealistic to hold that police officers must approach someone with whom they desire to speak in a manner which permits the person approached an avenue of vehicular escape.

6. See 361 U.S. 98, 103 fn. 7, 80 S.Ct. 168, compare id. at 104–106, 80 S.Ct. at 172–173 (dissenting opinion).

car of the defendant was not stopped by the agents.

In Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960), also cited by defendant, the defendant was riding in a taxicab which stopped for a traffic light. Two Los Angeles police officers, without a warrant or without probable cause to arrest the defendant, approached the cab for the purpose of making a routine interrogation. One of the officers identified himself as a policeman. According to the Supreme Court,

"[i]n the next minute there occurred a rapid succession of events. The cab door was opened; the petitioner dropped a recognizable package of narcotics to the floor of the vehicle; one of the officers grabbed the petitioner as he alighted from the cab; the other officer retrieved the package; and the first officer drew his revolver." (364 U.S. at 256, 80 S.Ct. at 1433)

Because of "the entanglement of other issues" (364 U.S. at 260, 80 S.Ct. at 1431) below which resulted in a confusing presentation of testimony pertaining to the "rapid° succession of events", the court refrained from deciding the question of when an arrest was made; instead, the case was remanded to the District Court for a determination of this "narrow question".

The following pertinent findings were made by the District Court:

"(2) That the taxicab in which the defendant was riding was not stopped by the officers;

(3) That it stopped for a traffic light at a brightly-lighted intersection;

(4) That while the taxicab was thus stopped, Officer Beckman approached the taxicab on the right side and Officer Grace approached it on the left;

(5) That Officer Beckman flashed his flashlight on his badge, exhibiting it to the driver and to the defendant who was sitting in the back seat, to identify himself, and he did identify himself orally as a police officer;

(6) That after, and almost simultaneous with, such identification, the officer saw the defendant, and the defendant did, voluntarily take from his pocket a rubber contraceptive of a light color which appeared to the officer to be filled with a light powder, and defendant voluntarily dropped it to the floor of the cab;

(7) That immediately thereafter the defendant and Officer Beckman simultaneously reached for the door of the taxicab, and both opened the door;

(8) That defendant alighted from the cab, and he was not pulled or forced out of it by either officer; and that thereupon, and not before, Officer Beckman announced that defendant was under arrest on suspicion of narcotics; and thereupon, and not before, the defendant was under arrest; * * *." [7] (192 F.Supp. 888, 889 (S.D.Cal.1961))

In substance, then, the Rios trial court effectively found and determined that a defendant is not arrested when a police officer, who has not stopped defendant's vehicle, approaches a car, shows a defendant his badge, orally identifies himself as a policeman, and reaches for the door handle at the same time as the defendant.

The facts of the case at bar, when compared with those of Rios and applied to the conclusions of law reached in that case, constrain me to hold that no arrest was made at or before the instant when Copeland dropped the bag. The agents had not stopped Copeland's auto, nor had they detained defendant by word or deed. They had not identified themselves, inadvertently or by design, as police officers. They had neither accosted nor spoken to Copeland. Thus, there is no basis for finding or determining an actual or constructive arrest of Copeland as he here contends.

The motion is denied. It is so ordered.

7. The District Court's findings and conclusions apparently were never appealed.