In the Matter of AUDINO M., a Person Alleged to be a Juvenile Delinquent, Appellant.

First Department, December 4, 1973.

*Steven M. Schlussel* of counsel (*Carol Sherman* with him on the brief; *William E. Hellerstein* and *Charles Schinitsky*, attorneys), for appellant.

*Mark D. Lefkowitz* of counsel (*Stanley Buchsbaum* with him on the brief; *Norman Redlich, Corporation Counsel*), for respondent.

CAPOZZOLI, J. This is an appeal, in a juvenile delinquency proceeding, from an order of disposition which placed the juvenile involved on probation for a period of six months, which order followed a determination, after a fact-finding hearing, that said juvenile had committed acts which, if done by an adult, would have constituted the crime of criminal possession of a dangerous drug, in violation of section 220.15 of the Penal Law.

At the fact-finding hearing the arresting officer, Patrolman Lynch, testified as follows: " At approximately that particular time I was assigned to the Narcotics Unit in our precinct in plain clothes. We were asked to investigate a possible narcotics violation in the building of 80 [*sic*] East 110 Street. We came to the rear yard and we found that we were in the building of 4 East 110 Street. As we came into a back way, I noticed the young M., the respondent, in front of the front part of the building. We tried to get past him without him noticing us and all of a sudden he turned around and saw us. At that particular time I said, ' How are you doint [*sic*], M.? ', and he just took off out of the building and ran out into the street. I pursued after him and he was trying to — when I caught him he had his key in his door and was trying to get into his apartment house at 8 East 110 Street. I noticed a bulge in his pocket. I asked what he had in his pocket. He didn't say anything to me. *I reached into the pocket and came up with manilla envelopes with* ". (Emphasis added.)

At pages 9 to 10, on being examined by the Law Guardian, Officer Lynch testified as follows:

" Q. You saw this respondent in front of the building, is that correct?

" A. That's correct, right.

" Q. And you have then stated that you said hello to the respondent or you said how are you doing and he said, fine, and that respondent departed then from the front of the building?

" A. I didn't say ' fine '. I just said, ' How are you doing? ', and he took off.

" Q. You then came next to the respondent when he was in front of his own apartment house? Is that right?

" A. That's right.

" Q. Now, officer, at that time, did you say anything to the respondent?

" A. I said to him, what do you have in your pocket?

" Q. And did he say anything to you?

" A. No.

" Q. Did you say anything else to the respondent?

" A. No.

" Q. Then you stated that you reached into his pocket, is that correct?

" A. That's right." * * *

" CORPORATION COUNSEL: Was respondent under arrest at the time you went into his pocket after you saw him in front of his house?

" THE WITNESS: No, he wasn't.

" CORPORATION COUNSEL: He wasn't under arrest?

" THE WITNESS: No."

Whether or not the evidence obtained by the arresting officer is properly admissible against the respondent (appellant herein) must depend upon whether the arrest was a lawful one.

In *People* v. *Malinsky* (15 N Y 2d 86, 91) the court said: " A search, not authorized by consent or a search warrant, is deemed reasonable only if conducted as ' incident to a lawful arrest ' (*People* v. *Loria*, 10 N Y 2d 368, 373; see, also, *Beck* v. *Ohio*, 379 U. S. 89; *Rios* v. *United States*, 364 U. S. 253, 261–262; *Henry* v. *United States*, 361 U. S. 98, 100), and to effect such an arrest the arresting officers must have ' reasonable cause for believing ' that a crime has been committed and that the person arrested is the party responsible ".

It is clear to the majority that the record is barren of any evidence indicating that the respondent was engaged in any activity which could furnish a reasonable person with grounds to make a lawful arrest. In *People* v. *Loria* (10 N Y 2d 368, 373) the court stated: " The search and seizure could, however, be upheld if incident to a lawful arrest * * *. The validity of an arrest or any entry to effect an arrest without a warrant depends on there being probable cause to make the arrest. That probable cause, however, cannot be based upon evidence obtained as a result of the search, when the validity of the search itself depends upon the legality of the arrest. If there is no probable cause to arrest initially, the entry and subsequent search are illegal, for ' A search prosecuted in violation of the

Constitution is not made lawful by what it brings to light'
[citing cases].'' A groundless arrest may not be used as a
pretext to obtain evidence to justify the arrest. Neither
suspicion, nor equivocal behavior alone justifies a search.
(*People* v. *Corrado,* 22 N Y 2d 308; *People* v. *Brown,* 24 N Y
2d 421.) A search is good or bad when it starts and a bad
search is not made good by what it discloses. (*United States*
v. *Di Re,* 332 U. S. 581; see, also, Ringel, Searches and Seizures
Arrests and Confessions, ch. 14.)

At most, the officer had the right to frisk the respondent,
to pat his outer clothing to assure himself that no weapon
was in respondent's possession, but not to the extent of placing
his hand in the pockets of the respondent because, in so
doing, he clearly violated respondent's constitutional rights
against an illegal search. (*Sibron* v. *New York,* 392 U. S. 40.)

The case of *Matter of Jeffrey W.* (affd. 43 A D 2d 669), cited
by our dissenting colleague, is readily distinguishable from the
case at bar. In *Jeffrey W.* the arresting officer testified that
the theatre in which the arrest was made was known as a
place where there was substantial drug traffic. He was in the
men's room of the theatre when he observed one boy in a booth
and further observed, a short time later, a second boy enter
the same booth. Both boys remained in the booth for a period
of 30 seconds and one boy came out. When the second boy
came out the patrolman noticed a bulge on the boy's left hip
and he asked him what it was that he had on the side and, as
he attempted to reach the bulge, the boy placed his hand on
it. At the same time the officer reached for the bulge and took
away a gun which formed the bulge. The case was treated as
a stop and frisk situation, which is a far cry from an actual
search, as is presented in the case at bar. (*Sibron* v. *New York,*
*supra.*)

Prior to *Mapp* v. *Ohio* (367 U. S. 643) there would have
been no question as to the sufficiency and propriety of the
determination reached by the Family Court. However, every
one recognizes the impact the *Mapp* case has had on the work
of the courts. We can understand the frustration of our
dissenting colleague, who does not approve of the conclusion
reached by the majority, because he believes that it would have
been for the best interest of the respondent if the Family
Court had found him guilty. In that light the result may be
unfortunate, but it is the function and duty of this court to
construe, apply and enforce the law as it exists and as settled
by the precedents of higher courts, even though the result

reached may not meet with popular approval. We simply cannot make our own rules or law as cases come along. Until a change is made by higher authority we are bound by the law as it exists now, and if it results in guilty persons escaping punishment, that is beyond our power to remedy unless we are to treat binding precedents with disdain. Perhaps it may not be amiss to quote from an article written by Professors Hogan and Snee, of Georgetown University (47 Geo. L. J. 1, 22) cited in the dissenting opinion of *Draper* v. *United States* (358 U. S. 307, 321) where it is said: " ' it must be borne in mind that any arrest based on suspicion alone is illegal. This indisputable rule of law has grave implications for a number of traditional police investigative practices. The round-up or dragnet arrest, the arrest on suspicion, for questioning, for investigation or on an open charge all are prohibited by the law. It is undeniable that if those arrests were sanctioned by law, the police would be in a position to investigate a crime and to detect the real culprit much more easily, much more efficiently, much more economically, and with much more dispatch.' "

The order of disposition of the Family Court, New York County, entered in this juvenile delinquency proceeding on April, 12, 1973 (CAPUTO, J.), following a fact-finding determination entered on December 7, 1972 (OTTEN, J.), that appellant had committed acts, which, if done by an adult, would constitute the crime of criminal possession of a dangerous drug, should be reversed, on the law and petition dismissed, without costs and without disbursements.

McGIVERN, J. P. (dissenting). I would uphold the Family Court Judge (CAPUTO, J.) when he placed the youth on probation for a period of six months, on condition he co-operate with the Urban League; and I would affirm the determination of Family Court Judge (OTTEN, J.), when he found the youth to have been in possession of dangerous drugs, an act which, if committed by an adult, would constitute a crime (Penal Law, § 220.15).

Patrolman John Lynch, a plainclothesman, assigned to a narcotics unit, was investigating a building for a " possible narcotics violation " located at 8 East 110th Street, East Harlem, Manhattan. The officer and his partner proceeded to the rear of a tenement, which they discovered to be 4 East 110th Street, when they also observed the juvenile herein, a 14-year-old boy, in the front part of the structure. It was 1:30 P.M., a time when boys of that age are usually in school. As Patrolman Lynch tells it: " We tried to get past him with-

out him noticing us and all of a sudden he turned around and saw us. At that particular time, I said, ' How are you doint [sic], M.? ', and he just took off out of the building and ran out into the street. I pursued after him and he was trying to — when I caught him he had his key in his door and was trying to get into his apartment house at 8 East 110th Street. I noticed a bulge in his pocket. I asked him what he had in his pocket. He didn't say anything to me. I reached into the pocket and came up with manila envelopes ''. And the manila envelopes were 22 in number, containing marijuana. And there were also 12 tinfoil packets of cocaine. Such an assembly would indeed create a sizeable '' bulge '' — on a 14-year-old boy.

CPL 140.50 permits an officer to stop and question a person if he has a reasonable suspicion that the person was committing a felony or has committed a felony or Class A misdemeanor. And possession of a dangerous drug is a Class A misdemeanor.

Taking the totality of the circumstances: the nature of the officer's specific assignment, his expertise, the high crime background of the locality, the boy's apparent truancy, his flight, his silence, the enormous '' bulge '' in his trousers — and I conclude the street-wise officer was justified in his actions. And I am unable to distinguish the instant case from Matter of Jeffrey W. (affd. 43 A D 2d 669), where again an alert police officer descried a '' bulge '' on the left hip of a boy in a men's room in a theatre, and inspection displayed a loaded gun. The Family Court, Kings County (RAMIREZ, J.), placed the youth in the State Training School. And the Appellate Division, allowing the revolver in evidence, unanimously upheld the Family Court.

Jeffrey W. (supra) is in line with the disposition recently adopted by this tribunal in the Matter of Ricci S. (41 A D 2d 406) wherein, again sustaining the Family Court (DEMBITZ, J.), we refused to suppress a safari knife found by a policeman on a young man in Chelsea as he sallied forth from a house under observation for narcotics.

There is nothing innovative about the foregoing. In People v. Rosemond (26 N Y 2d 101, 103-104 [1970]) the Court of Appeals stated that section 180-a of the Code of Criminal Procedure (the predecessor of CPL 140.50):

'' is not the beginning and the end of the right and duty of police to make inquiries of people on the public streets. Nor does it prescribe the full scope of police activity. * * *

'' A statute, such as this one, addressed to a particular situation and designed to give legal justification for specially pre-

98

scribed procedures ought not to be read to narrow down *the normal duty of police to find out by suitable inquiry what is going forward in the public streets* " (emphasis supplied).

And, again, it must be remembered, we are not evaluating quantum of proof as required for a conviction, but only whether an officer, having been informed that the building was being used for narcotics purposes, had reasonable grounds for the search of a reticent urchin whose conduct aroused his educated judgment. We must view the episode not through the eyes of a layman, but of an officer on a specific mission. And the fact that he was correct is not insignificant. (*People v. Fenuta,* 39 A D 2d 674; *People v. Meyers,* 38 A D 2d 484.)

Lastly, I cannot forbear the observation that the learned Family Court Judge herein, not only did the right thing legally, he did what was right for the boy. This youth was clearly a courier, being used as a walking warehouse by dope " pushers ", latter day " Fagins ", so that if the plainclothesmen moved in, this poor young gamin would be found as the possessor of the drugs, while his masters, the adult vermin, and the real villains, would go free. For it is well known that since the enactment of the new drug laws, the professional merchants have gone underground. And this " Court should not be ignorant as judges of what we know as men." (*Watts v. Indiana,* 338 U. S. 49, 52.) We honor not the Constitution by straining its filamentary refinements to such blind and unrealistic lengths that we stretch it to protect such a sordid operation. We not only defeat able police work, we keep free the guilty, and in this instance, do a rare disservice to the boy. The majority, overriding the prudent disposition of the Family Court Judge, wise in these matters, send the youth back to the asphalt jungle, unsupervised, and in all probability, release him for a repeat performance as a perambulating inventory of death-dealing drugs.

The punishment meted out to this juvenile, six months' probation, in collaboration with the Urban League, was constructive and benign, and would have benefited the boy.

Hence, I would keep hands-off and affirm; or at most remand to the Hearing Judge for findings.

Murphy and Lane, JJ., concur with Capozzoli, J.; McGivern, J. P., dissents in an opinion in which Steuer, J., concurs.

Order of the Family Court of the State of New York, New York County, entered on April 12, 1973, reversed, on the law, and the petition dismissed, without costs and without disbursements.