The very foundation of our state government is the Ohio Constitution which is essentially a mirror image of the most durable document ever written, the United States Constitution. The hallmark of both documents, indeed the cornerstone upon which our government has rested for over two hundred years, is the guarantee that no person shall be deprived of their rights without due process of law. Key and central to those rights is the right to liberty, or more succinctly, freedom. Our government was founded upon the proposition that no person shall be imprisoned without due process of law. Ohio Revised Code 2967.11, which purports to establish a "rules infraction board" within the prison system, is a clear violation of that basic tenet of our government; and any effort to "sentence" a prisoner to additional "bad time" by a quasi-judicial prison official is not only morally offensive, it is unconstitutional.
As stated by the Supreme Court of Ohio in State v. Hochhausler
(1996), 76 Ohio St.3d 455, 463, the separation of powers, which clearly provides for judicial review before one's liberty may be infringed upon, is deeply imbedded in the framework of our state government. The logic is unassailable. There simply must be a neutral magistrate, at whatever level of the judiciary, standing between the accused who wants to remain free, and the law enforcement officials whose very function in society is to facilitate the process of placing law offenders behind bars. Policemen and jail officials serve a necessary and commendable function in any free society. They protect all citizens from criminals. It is never their job, however, to determine which criminal should be in jail and which one should be free. In an analogous constitutional review, the Supreme Court of Ohio described the weighing exercise which is essential prior to the infringement of any individual right which must be temporarily deferred in the public interest:
 "Briefly summarized, this court is required to apply the federal constitutional standards of probable cause as pronounced by the United States Supreme Court. State v. Joseph [(1971), 25 Ohio St.2d 95]. The recurring polestar and fundamental theme in such pronouncements is that the constitutional mandate of the Fourth Amendment that `no warrants shall issue but upon probable cause' requires the interposing of a neutral magistrate between the officer and a citizen's right of privacy (see Johnson v. United States [1948], 333 U.S. 10), * * *". State v. Graddy (1978), 55 Ohio St.2d 132, 134.
Therefore it is clear that the Supreme Court of Ohio has decided that before one constitutional right may be infringed upon, the official seeking permission to so intrude must, as a matter of constitutional law, seek the intervention of a judicial officer as a condition precedent to the intrusion. More directly, the Supreme Court held in State v. Carter (1994), 69 Ohio St.3d 57,64-65, quoting Chief Justice Earl Warren:
 "`* * * And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? Cf. Carroll v. United States, 267 U.S. 132 [45 S.Ct. 280, 69 L.Ed. 543] (1925); Beck v. Ohio, 379 U.S. 89, 96-97 [85 S.Ct. 223, 229, 13 L.Ed.2d 142, 148] (1964). Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. See, e.g., Beck v. Ohio, supra; Rios v. United States, 364 U.S. 253 [80 S.Ct. 1431, 4 L.Ed.2d 1688] (1960); Henry v. United States, 361 U.S. 98 [80 S.Ct. 168, 4 L.Ed.2d 134] (1959). And simple "`good faith on the part of the arresting officer is not enough.' * * * If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be `secure in their persons, houses, papers and effects,' only in the discretion of the police." Beck v. Ohio, supra, [379 U.S.] at 97 [85 S.Ct. at 229, 13 L.Ed.2d at 148].' (Emphasis added; footnotes omitted.) Terry [v. Ohio (1968), 392 U.S. 1, 21-22]."
The United States Supreme Court, in Johnson v. U.S. (1948),333 U.S. 10, 13-14, clearly recognized that there is a competing interest between society as a whole in its fundamental right to be protected from criminals and the rights of individuals to be free from unwarranted government intrusion. As stated by Justice Jackson:
 "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."
Incredibly, the Ohio Legislature has created a new, and independent quasi-judicial branch of government within the prison system and granted them the authority to sentence prisoners toadditional prison time for so-called "bad time" for offenses theoretically committed in jail. This in-house court system nonsense is clearly at odds with Article IV, Section I of the Ohio Constitution which provides:
 "The judicial power of the state is vested in a supreme court, courts of appeals, courts of common pleas and divisions thereof, and such other courts inferior to the supreme court as may from time to time be established by law."
The various courts of this state have consistently held, and this Court in my opinion should immediately hold, that any violation of the separation of powers inherent in our system of government is unconstitutional and shall not be permitted. The Ohio Constitution applies the principle in defining the nature and scope of powers designated to the three branches of the government. State v. Warner (1990), 55 Ohio St.3d 31; see, Statev. Harmon (1877), 31 Ohio St. 250, 258. Furthermore, "`each of the three grand divisions of the government, must be protected from encroachments by the others, so far that its integrity and independence may be preserved. * * *'" South Euclid v. Jemison
(1986), 28 Ohio St.3d 157, 159, (quoting Fairview v. Giffee
[1905], 73 Ohio St. 183, 187).
This fundamental failure to protect the due process rights of those charged with misdeeds while imprisoned literally ignores court precedent in Ohio and attempts to create a new class of citizen who has no rights. In an analogous situation, every day law enforcement officials seek to terminate the privilege of probation when they feel a probationer has failed to live up to his side of the bargain. In a well reasoned opinion, the Tenth District Court of Appeals, in Columbus v. Bickel (1991), 77 Ohio App.3d 26,34, stated as follows:
 "To preserve a probationer's liberty as long as he substantially complies with his conditions of probation, the United States Supreme Court in Gagnon v. Scarpelli (1973), 4ll U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656, established both a bipartite procedure for probation revocation when a sentence has previously been imposed, as well as six minimum due process requirements applicable in final probation revocation hearings. See, also, State v. Miller (1975), 42 Ohio St.2d 102, 71 O.O.2d 74, 326 N.E.2d 259. First, a preliminary hearing is conducted to determine whether there is probable cause that a probationer violated one or more conditions of his probation. Only after this wholly factual question is answered affirmatively may the court conduct a final revocation hearing to determine whether probation should be revoked or continued. Morrissey v. Brewer (1972), 408 U.S. 471, at 479-480, 92 S.Ct. 2593, at 2599-2600, 33 L.Ed.2d 484, at 493. At the final revocation hearing, the court must comply with the following six minimum due process requirements:
 "`"(a) [W]ritten notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a `neutral and detached' hearing body * * * and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." * * *' Id. at 489, 92 S.Ct. at 2604, 33 L.Ed.2d at 499; Gagnon, supra, 411 U.S. at 786, 93 S.Ct. at 1761, 36 L.Ed.2d at 664."
Note the distinction. A probation violator about to lose aprivilege is afforded far more due process guarantees than a prisoner who is about to lose a constitutional right. R.C. 2967.11
requires sentencing courts to abdicate part of their sentencing authority, permitting an institutional "rules infraction board" to add time to a prisoner's sentence. In extending a prisoner's sentence for bad acts allegedly committed in jail, the state by definition is taking away a fundamental constitutional right to liberty. The Supreme Court of Ohio has clearly stated this cannot be done without the intervention of the judiciary in a meaningful hearing, and I agree.
The majority suggests that this issue is not ready for review by this Honorable Court because the appellant herein has not actually yet received any "bad time." I must respectfully disagree. In the sentencing entry, the trial court has clearly indicated that they ratify and incorporate in their sentence anyfuture additions to the sentence which may be imposed by the use of R.C. 2967.11 and ordered the defendant to serve "any bad time imposed." This purported transfer of sentencing authority to prison guards and their in-house tribunals can never be tolerated in a free society. The minute the ink was dry on the judge's entry, the prisoner was in peril at the whim of his jail keepers. Bad time? It's a good phrase. For if the Ohio Legislature is successful in permitting jailers to determine how long prisoners remain in jail, it is a bad time for us all indeed. __________________________ JUDGE WILLIAM M. O'NEILL