THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* JAMES LEROY REASON and JAMES SCOTT, Defendants.

Supreme Court, Trial Term, New York County, December 16, 1966.

426

*George C. Sena* for James Scott, defendant. *Anthony F. Marra* and *Dorothy Cropper* for James Leroy Reason, defendant. *Frank S. Hogan, District Attorney (Joseph Heneghan* of counsel), for plaintiff.

THOMAS C. CHIMERA, J. Defendants (on bail) await trial of two separate indictments, both filed May 5, 1966. Indictment No. 1599-66 charges both defendants with two counts feloniously possessing a narcotic drug with intent to sell and feloniously possessing a narcotic drug. Indictment No. 1601-66 charges both defendants with three counts, burglary in the third degree, grand larceny in the second degree, and possession of burglar's instruments (a key).

This was a hearing originally brought on formal motion pursuant to sections 813-c, 813-d and 813-e of the Code of Criminal Procedure by only one of the defendants, to suppress physical evidence on the trial of both indictments. By consent, the application was enlarged to include the other defendant and to add a " Huntley " issue, service of formal notice required by sections 813-f, 813-g, 813-h and 813-i of the Code of Criminal Procedure, having been waived on the record by defendants.

A New York City Police Deputy Inspector was the only witness at the hearing. His testimony was clear, candid and entirely believable.

He testified that on March 15, 1966, at approximately 11:55 A.M., while riding in his unmarked automobile, proceeding south on St. Nicholas Avenue, just north of 145th Street in Manhattan, at or near No. 714 St. Nicholas Avenue, he observed defendant Scott, who was carrying a portable phonograph, standing out in the gutter where the latter had just hailed a taxicab then in line of traffic moving directly in front of the witness' own car; that after defendant Scott got into the cab, the defendant

Reason, whom the witness had not seen up to that time, came from behind a car which was then parked at the curb and *very quickly* ran into the taxicab, lugging a "portable" television set which the witness judged to weigh from 40 to 50 pounds. The witness went on to say that he had attended a community meeting "just a few days or a day or so prior to that incident", at which the residents had discussed with the police the alarming number of burglaries which had been recently committed in this very area. With this in mind, the activities of the defendants, "basically" the suddenness of Reason's appearance, his haste in boarding the cab and the weight of the T. V. set which he was lugging at the time, the witness said he "suspected that something was wrong", he determined to and did in fact follow the cab.

Both defendants are Negroes. No. 714 St. Nicholas Avenue is located in a densely populated, predominantly Negro area. The incident occurred in the daylight hours and there were quite a number of people on the street. Except for the community meetings above referred to, there had been no previous report that anything was happening at the time in question or had happened in that particular building or in the immediate surroundings. No evidence was produced at the hearing suggesting that a burglary or theft had taken place there or identifying the items at issue as things actually stolen.

The witness testified further that he lost sight of the cab for a time but did finally catch up with it on Lenox Avenue between 137th and 138th Streets just as defendants were alighting from it. At this point, he continues, he enlisted the services of two uniformed police officers who were seated in a motor patrol car standing in the immediate vicinity; that after a conversation with the two patrolmen, the three of them approached the defendants who had already removed the phonograph and the T. V. set from the cab and placed them on the roadway close to the sidewalk, and then, the witness continues, he saw defendant Reason place a tin box on top of the phonograph. ("It was a box that it had a lock. It wasn't locked. A regular key lock, what you could keep valuable papers in. The old tin box type of item.") The witness goes on to say that while the three officers were standing around defendants "all in a circle more or less", he began to address questions to defendants. He admits that neither he nor his associates ever attempted to inform defendants of their asserted constitutional rights to remain silent, to counsel, etc., but insists that he did inform them that he was a police inspector although he displayed no shield to them since the police uniforms of his associates were, in his

judgment, sufficient notice of the character of his calling and purpose. He insists that no physical force was used by anyone and that none was necessary. Asked by the court: "Inspector, were they [the defendants] free to go?", the witness answered: "I feel if they would have started to move, I would have restrained them; but they didn't". All this line of inquiry was designed by court and counsel to ascertain whether the defendants, prior to the fateful questioning, had been taken into police custody or otherwise deprived of their freedom of action in any significant way. The witness testifies further that in words or substance he asked them what they were doing with the phonograph and T. V. set; that "defendant Reason stated that he had to move in a hurry out of 714 St. Nicholas Avenue. He had an apartment there, and he had to move quickly." The witness continued that he could not remember whether defendant Scott said anything in answer to this first question. The next question, witness says, was addressed to defendant Reason: "I asked him what was in the tin box and the defendant Reason stated it was personal papers;" that when the witness questioned this answer and asked defendant Reason to open the box defendant Reason opened up the box and "there were 60 or 70 envelopes of what was apparently marijuana".

"Q. [by the District Attorney] Did you question him about the contents of the box. A. I stated, 'that's not personal papers.' At that time—I'm quite sure it was Reason—he stated, 'We have nothing to do with this stuff. We did burglarize an apartment, and this was in the apartment. And we didn't know what it was until we opened it in the taxicab'. At that time, I don't know the specific questions, but defendant Scott mentioned his brother had found a key with the address and apartment number on it, and they had gone to that apartment and entered the apartment, and stated they had taken the radio phonograph and the tin box  *  *  *

"Q. Had you placed these defendants under arrest? A. Not until—when the marijuana was shown, that is when—and the statement was made—that is the first—then they were put under arrest."

The problem before this court is multi-faceted and of constitutional dimensions involving as it does the Fourteenth Amendment to the Federal Constitution which, it is settled, secures against State invasion the same privileges that the Fourth and Fifth Amendments guarantee against Federal infringement (*Mapp* v. *Ohio*, 367 U. S. 643; *Malloy* v. *Hogan*, 378 U. S. 1; *Miranda* v. *Arizona*, 384 U. S. 436 [June 13, 1966]; *Schmerber* v. *California*, 384 U. S. 757 [June 20, 1966]).

On this record I find the following facts:

1. That the police were not merely seeking information. The nature of the police interrogation establishes that defendants were clearly under suspicion of burglary and larceny and the questions themselves were designed to elicit exculpatory or inculpatory statements from the defendants.

2. That long before the fateful police interrogation, suspicion had sufficiently focused on defendants to establish a subjective police intent to detain defendants, to interrogate them and to search them for weapons. Moreover, a fair analysis of the police testimony at the hearing establishes that the police had no intention to release defendants until their objectives were fully accomplished.

3. That the police suspicion and the defendants' detention were both reasonable and justified under the circumstances.

4. That until the narcotics were exposed there was neither an arrest nor probable cause to make an arrest.

5. That without defendants' utterances (exculpatory and inculpatory), none of the physical items in question would have been revealed as fruits of the alleged crimes of burglary, larceny and possession of burglar's instruments charged in Indictment No. 1601-66; and, finally,

6. That the exposure of the contraband (marijuana) was the result of a police search for weapons in every fair sense of those terms wholly independent of any of the utterances charged to defendants.

My finding that the evidence established a subjective police intent to detain defendants, to interrogate them and to search them for weapons is based on the witness' testimony and the nature and experience of the police operation. It would be fatuous, in my opinion, to conclude that a police officer detaining a suspected thief would be foolish enough not to search the suspect for weapons. The notion that thieves might be armed is not so far-fetched that it would be unreasonable, in my judgment, for an officer to search a person, suspected of burglary and larceny, for weapons.

From the application of common sense to the testimony here, it is clear to me that these police officers would have searched defendants for weapons even if defendants had not answered the questions put to them by the witness.

*Miranda* (*supra*) reaffirms the principle rooted in the common law, that the police are not precluded " from carrying out their traditional investigatory functions " but proscribes the use as evidence, of *confessions and oral admissions* elicited from per-

sons who had already "been taken into custody or otherwise deprived of (their) freedom of action in a significant way", unless such persons had first been *meaningfully* warned of, or consciously waived, certain specified constitutional rights. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intentionally." (*Miranda*, p. 444).

In Sobel's, The New Confession Standards, *Miranda* v. *Arizona* (Criminal Law Bulletin, Inc., & Gould Publications, 1966), we find the following statement (p. 56):

"There is, it should be noted, some language in Miranda which, considered outside of the context of discussion, would indicate that the new rules apply to interrogation in the police station or other police-dominated environment 'unfamiliar' and 'menacing.' But as discussed, these were references to specific facts in the several cases. Miranda, Vignera, Westover and Stewart were all questioned at the *police station*. This was what the court appeared to be discussing.

"There has as yet been no authoritative decision on this point."

My learned colleague astutely observed however (The New Confession Standards, p. 58): "If by 'custody' is meant only in the confines of the station, the police need only delay physical transfer of the accused in order to circumvent the constitutional safeguard."

As an aside, I deem it proper and overdue to acknowledge Mr. Justice Sobel's heroic work in this and in associated fields. His latest publication, in my judgment, will prove prophetic in many instances.

Upon my conclusion that *Miranda*, read as a whole, establishes that neither arrest nor interrogation in a police station is indispensable to a finding of custodial interrogation, *Miranda* becomes a specific for the other questions raised by the statements charged to these defendants. The mandated warnings apply to persons *merely suspected* as well as to persons actually accused (*Miranda*, p. 467). It makes no difference whether the statements elicited are exculpatory, inculpatory or a combination of both or whether the statements are direct confessions or admissions of part or all of an offense (*Miranda*, pp. 476, 477).

The "Huntley" issue was orally disposed of on the record, in favor of defendants, this court having ruled on the foregoing

facts that the doctrine of *Miranda* (*supra*), was applicable, since, in my judgment, these defendants had in fact been *deprived of their freedom of action in a significant way* and had not been warned of their constitutional rights nor *consciously* waived them, before the fateful police interrogation was commenced.

Thus all *utterances* charged to defendants have already been suppressed as evidence on the trial of both indictments scheduled to follow.

The court addressed its attention next to the question whether any of the items impounded by the police — the phonograph, the T. V. set, the key, the tin box and the bags of marijuana, should also be suppressed as evidence on the trial of either or both indictments. Extensive argument on the record followed and decision on this issue was reserved.

Defendants argue first that there is an element of inconsistency in the suppression of the alleged oral admissions and the retention of any of those items, reasoning that the exposure of the items themselves and the oral admissions attributed to defendants were in such close proximity as to be almost inseparable. This argument depends for persuasiveness on a finding that all of the items in question were in fact " poisoned fruit " either because they were the end result of information obtained through oral admissions illegally acquired or product of an unreasonable search and seizure.

Insofar as Indictment No. 1601-66 is concerned, the argument is persuasive, for, absent the oral admissions already suppressed, the identification of those items as fruit of the crimes of burglary, larceny and possession of burglar's instruments would not have materialized, and, in the absence of other prima facie proof on this record that a phonograph, T. V. set, tin box and its contents were in fact stolen, there could be no basis for a valid warrantless arrest and therefore no legal justification for *their* retention by the police for use as evidence on the trial of an indictment charging burglary, larceny and possession of burglar's instruments.

As a general proposition, if fruits of a crime or contraband are revealed as a result of unconstitutional police procedures — in the absence of waiver or " attenuation " (dissipation of the primary–taint doctrine of *Wong Sun* v. *United States,* 371 U. S. 471, 491), such fruits or contraband must be suppressed as " fruits " of the " poisoned tree ".

Neither waiver nor " attenuation " is claimed here. The utterances charged to defendants here are indeed a " poisoned tree " but the narcotics sought to be suppressed are not fruit

of that tree insofar as Indictment No. 1599-66 is concerned, as will be developed hereafter.

The mandate of *Miranda* (*supra*), for the moment at least, appears to have settled the questions arising from confessions and admissions resulting both from an arrest and from "traditional" police interrogation. A careful review of recent top level Federal decisions covering the law of searches and seizures would seem to suggest however, that although the questions arising from an arrest (lawful and unlawful) have also been answered, the last Federal word has not been uttered on the law of searches and seizures resulting from a police detention not amounting to an arrest in the first instance.

Nor is this the result of oversight since it is abundantly clear that each such situation must be left to the trial court separately to be examined by a judicial process, the principal ingredient of which should always remain *reason* and *common sense*.

*Schmerber* (384 U. S. 757, *supra*), dramatically terminates the dialectics in constitutional law circles on the question whether physical searches and seizures stand on the identical footing proscribing confessions and admissions. There it was held, among other things, that the legality of police physical searches and seizures, independent of confessions and admissions, is affected in *no* way by a failure to *warn* an accused of *any* of his constitutional rights.

No discussion of the reasonableness of specific searches and seizures would be fruitful unless the obvious is kept in constant focus.

1. That seizures are not proscribed by the Fourth Amendment to the Constitution.

2. That only unreasonable searches are proscribed, and,

3. That fruits of a crime must be viewed in a different light than contraband, principally because the identity of the former as such generally depends on extrinsic factors, while the *mere possession of contraband, because of its nature alone, constitutes a crime to possess.*

The second argument made by defendants suggests that the contraband (marijuana) is "poisoned fruit", if not because of the utterances attributed to defendants, at the very least, because it was exposed as a result of a warrantless arrest made without probable cause.

While the line between detention and arrest is a thin one more often than not, both the difference between them and the rationale for this difference has been consistently recognized by both Federal and State courts since time immemorial. "The precise time at which an 'arrest' occurred within the meaning

of section 167 of the Code of Criminal Procedure, should be determined as a question of fact whenever such time becomes a relevant factor (*Rios* v. *United States,* 364 U. S. 253, 262). * * * it should be borne in mind that the police have the right to approach persons for the purpose of routine investigation; and that such investigation does not constitute arrest (*Rios* v. *United States; United States* v. *Vita,* 294 F. 2d 524, cert. den. 369 U. S. 823; *Busby* v. *United States,* 296 F. 2d 328, cert. den. 369 U. S. 876).'' (*People* v. *Entrialgo,* 19 A D 2d 509, 511, affd. 14 N Y 2d 733. See, also, *Ker* v. *California,* 374 U. S. 23; *Miranda* v. *Arizona, supra*; *People* v. *Rivera,* 14 N Y 2d 441; *People* v. *Peters,* 18 N Y 2d 238 and *People* v. *Pugach,* 15 N Y 2d 65.)

It is fundamental in both Federal and State law that '' the States are not * * * precluded from developing workable rules governing arrests, searches and seizures to meet ' the practical demands of effective criminal investigation and law enforcement ' in the States, provided that those rules do not violate the constitutional proscription of *unreasonable* searches and seizures and the concomitant command that evidence so seized is inadmissible against one who has standing to complain '' (*Ker, supra,* p. 34; emphasis ours).

In our State, judicial action (*Rivera, Peters* and *Pugach, supra*) and legislative action (Code Crim. Pro., §§ 167, 177 and 180-a) have established workable rules governing arrests and police inquiries on the one hand and searches and seizures on the other.

An '' arrest is the taking of a person into custody that he may be held to answer for a crime '' (Code Crim. Pro., § 167).

It is fundamental of course that the police are permitted by law to make a reasonable search as an incident to a valid arrest with or without a warrant and that a warrantless police search without consent, *if conducted as an incident to an actual arrest,* depends for its validity on '' probable cause '' in the first instance. (*Rios* v. *United States, supra,* and *Henry* v. *United States,* 361 U. S. 98.) '' Probable cause exists where ' the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that ' an offense has been or is being committed '' (*Brinegar* v. *United States,* 338 U. S. 160, 175–176).

Too often *Rios* and *Henry* (*supra*) have been cited for the naked assertion that a warrantless police search without consent is reasonable *only* if conducted as an incident to an actual arrest based upon probable cause for believing that the defendant has

committed or is committing a crime. I do not read *Rios* and *Henry* that way. More important—neither does our Court of Appeals! What would be the sense of remanding *Rios* to the District Court for further proceedings aimed at determining when the arrest actually took place if not because a clear finding that the search was conducted before the arrest would depend for its validity on rules different than those applicable to a search incident to an arrest? And as for *Henry*—is it not obvious that that decision was " probable cause "—oriented from the fact only that the court there concluded from the beginning that the search followed an actual arrest? What other significance can these statements from *Henry* (*supra*) have?

" The issue in this case is whether there was probable cause for the arrest leading to the search that produced the evidence on which the conviction rests " (p. 98), and " The Court decides this case on the narrow ground that the arrest took place at the moment the Federal Bureau of Investigation agents stopped the car in which petitioner was riding and at that time probable cause for it did not exist " (dissenting opn., p. 104).

Anomalous as it may appear at first blush, I have concluded that although all utterances and all physical evidence must be suppressed on the trial of Indictment No. 1601-66, only the utterances, the phonograph, the T. V. set, the tin box and the key should be suppressed on the trial of Indictment No. 1599-66. I am convinced that the contraband itself should not be suppressed on the trial of the indictment last mentioned, to a great extent, because of my interpretation of section 180-a of the Code of Criminal Procedure and *Rivera, Peters* and *Pugach* (*supra*).

As a preface to the balance of this opinion, I quote from the Court of Appeals in *Peters* (18 N Y 2d 238, 247, *supra*): " The attempt to apply a single standard of probable cause to all interferences—i.e., to treat a stop as an arrest and a frisk as a search—produces a standard either so strict that reasonable and necessary police work becomes unlawful or so diluted that the individual is not adequately protected. The varying standards now in effect through our decision in *Rivera* and through section 180-a best resolve this problem."

Section 180-a of the Code of Criminal Procedure authorizes the police to stop and question any person in a public place " *whom he reasonably suspects is committing, has committed or is about to commit a felony* " or certain misdemeanors, and if the policeman " *reasonably suspects that he is in danger * * * he may search such person for a dangerous weapon.*"

Whether the United States Supreme Court will sustain the

holding and reasoning of our Court of Appeals in *Rivera* is an idle speculation in which New York State courts nisi prius may not indulge. Unless and until the Supreme Court rules otherwise, *Rivera* will be the " bible " in situations such as ours.

*Rivera* (*supra*) declares it to be the business of police to prevent crime; that prompt inquiry into " suspicious or unusual street action " is an indispensable police power and the evidence needed to make the inquiry is not of the same degree or conclusiveness as that required for an arrest; that stopping of an individual to inquire is not an arrest; that it is the reasonableness of the officer's suspicion which is determinative; that the place where the events transpire is only one factor in weighing this suspicion and that a " frisk " (for weapons) is a reasonable and constitutionally permissible precaution to minimize the hazards and dangers involved in this kind of police duty, distinguishable on pragmatic grounds from the degree of constitutional protection that would surround a full-blown search of the person.

*Peters* (*supra*) reviews with approval the principles laid down in *Rivera*, among other important statements, adding the following (18 N Y 2d 238, 244–245):

" The phrase ' reasonable suspicion ' provides a defined standard and is, in fact no less endowed with an objective meaning than is the phrase ' probable cause.' Courts will have no difficulty in applying this standard and have frequently in the past referred to ' suspicion ' or ' reasonable suspicion ' as terms with a definite meaning, *somewhat below probable cause on the scale of absolute knowledge of criminal activity* " (emphasis supplied).

" The frisk is a reasonable and constitutionally permissible precaution to minimize that danger. Since the frisk was held to be legal, the seizure of the evidence of a crime which was thereby discovered was legal " (p. 243).

" The fact that the frisk produced an envelope containing burglar's tools rather than a knife is not determinative. As we said in *Rivera*, ' The fact that the police detective actually found a gun in defendant's possession is neither decisive nor material to the constitutional point in issue. The question is not what was ultimately found, but whether there was a right to find anything.' " (pp. 243–244).

Paraphrasing the first sentence of the last quotation — the fact that the " frisk " (here) produced contraband rather than a weapon is not determinative. " The frisk is necessary on grounds of elemental safety. Even when the police officer has the upper hand, the tables are easily turned. The policeman

should not be forced to deal with the possibility of a suspect's going for a concealed weapon where he reasonably suspects the presence of such weapon." (*Peters*, p. 245.)

*Pugach* (*supra*) *goes one step further, holding that a loaded firearm concealed in a brief case* carried in the hands of a suspect is, in the language of section 1897 of the Penal Law, " concealed upon his person." " The fact that the loaded gun was found concealed in the brief case, rather than in a pocket of defendant's clothing, affords no ground for saying that this ' frisk ' was in reality a constitutionally protected search " (p. 69).

Paraphrasing this quotation with *Peters* in mind, the fact that the contraband was found concealed in a tin box carried by one of the defendants rather than a brief case, affords no ground for saying that this " frisk " was in reality a constitutionally protected search.

I have concluded from the evidence that the exposure of the contraband was the result of a *search for weapons* in the fair sense of those words; that the exposure was related to the detention which was reasonable under the circumstances and that the " search " was conducted with commendable restraint. Moreover, I have also concluded that the exposure was only remotely related to the utterances charged to these defendants and that it was in no fair sense dependent on the utterances in question.

Assuming a search for weapons, is there any question that the contraband would have been exposed?

I see no purpose anymore in splitting hairs over the distinction between a frisk and a search unless one applies the term " frisk " to a search for weapons only. *Pugach* has taken care of that! How does one pat a tin box (such as was here described) for weapons and, for that matter, a brief case?

Assuming a weapon in a tin box such as was here described, or in a brief case — who can say whether such a weapon is not as readily accessible as it might be, were it lodged in a pocket of a suspect's clothing!

On the foregoing conclusions, the motion insofar only as it seeks the suppression of the marijuana as evidence on the trial of Indictment No. 1599-66, is denied. The motion is granted in all other respects, however.