Edward T. Sullivan, J.
Hearing held March 18 and March 19, 1968 on two pretrial motions to suppress evidence in the above action wherein the defendant is being prosecuted on a charge of murder in the second degree, section 1046 of the former Penal Law, under Indictment No. 1609-67 of the Grand Jury of Saratoga County, September 1967 Term of the Supreme Court. After arraignment and a subsequent bail application wherein same was fixed and defendant released thereon, the *291 case was transferred by the Supreme Court to Saratoga County Court.
By stipulation, to avoid repetition of the same testimony, one hearing was held for both motions; and the hearing proceeded initially on the motion for suppression of an alleged oral admission and an alleged oral confession under section 813-g of the Code of Criminal Procedure, and then proceeded on the motion for suppression of evidence alleged to have been obtained as a result of unlawful search and seizure under section 813-c of the Code of Criminal Procedure and by consent, the hearing was held with all witnesses, except the witness actually testifying and the defendant, remaining outside the closed hearing room.
Defendant was arraigned on June 12, 1967 on an information charging murder in the first degree under section 1044 of the former Penal Law before Malta Town Justice, Morgan E. Blood-good; entered a plea of “not guilty”; and requested a preliminary hearing. On August 17, 1967 a preliminary hearing under section 190 et seq. of the Code of Criminal Procedure was held before the same justice, who found that the crime of murder in the first degree had been committed, that there was reasonable ground to believe the defendant guilty thereof, and ordered that she be held to answer for the same. A photocopy of the transcript of the preliminary hearing was made a part of the motion for the suppression of the alleged oral admission and oral confession.
Defendant brings her initial motion upon the ground that her alleged statements, confession and/or admission, either inculpatory or exculpatory, either oral or written, were and are inadmissible as evidence against her in that they were obtained from her during impermissive pre-arraignment, in-custodial interrogation by the New York State Police in violation of her constitutional guarantees under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution as proclaimed and fixed as guidelines for State law enforcement officials and State trial courts by the United States Supreme Court on June 13, 1966 in (1) Miranda v. Arizona, (2) Vignera v. New York, (3) Westover v. United States and (4) California v. Stewart (384 U. S. 436), all of which are herein called the Miranda case.
The companion motion for suppression of tangible property, including a metal cooking pot and a knife, is based on the Fourth Amendment of the United States Constitution guaranteeing that the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, *292 shall not be violated, and guaranteeing the condition of issuance of warrants.
PART i
The facts established by the preliminary hearing and the admissibility hearing are as follows:
Shortly before 10:00 a.m. on Monday, June 12, 1967, defendant’s son, Michael Okon, reported via telephone to the New York State Police his discovery of the dead body of his stepfather, Joseph Paulin, a New York State Police Sergeant, in the family residence, 18 Barcelona Drive, Clifton Knolls, Town of Clifton Park, Saratoga County, N.Y. Uniformed Lieutenant Raymond J. Kuzia, pursuant to radio dispatch, telephoned Acting Troop Commander, Captain James Smith, at Troop Headquarters, Loudonville, N.Y., who advised him of the report and instructed him to proceed to Sgt. Paulin’s house. Lt. Kuzia arrived at about 10:00 a.m. and was led by the stepson to the guest room clothes closet, wherein he saw the dead body which was later identified as that of the victim.
Lt. Kuzia was asked:
“ Q. What did you do then? “A. Well, as I say, I dropped the covering back over the body. I asked Michael if he knew anything about this and as I recall he said no but it must have happened Friday, as ”.
Significantly, Michael Okon was not questioned again and the record establishes that he was not subjected to any form of detention. Further, the record establishes that it is State Police policy, practice and instruction to handle every death as a homicide.
Lt. Kuzia then reported via the basement telephone his finding to Captain Smith and requested assistance. He returned upstairs to the living room area and, for the first time that day, saw the defendant. He testified she was barefooted, wearing a blue housecoat and was coming from the direction of the master bedroom. She asked him who he was and what he was doing there. Lt. Kuzia identified himself and told her he “ was there to see about Joe ”.
At this point in the chronology of events, there is a variance in the testimony of the two key witnesses for the People. At both the preliminary hearing and the suppression hearing, Captain Chieco testified that upon his arrival at about 11:15-11:30 A.M., Lt. Kuzia, in briefing him on events up to that time, told him that when the Lieutenant first saw the defendant, that she mentioned something about having a terrible fight, that he *293 observed a cut on her left hand, and that believing she might possibly be a suspect, he immediately advised her of her rights under the Miranda case.
According to Lt. Kuzia’s testimony, he began questioning the defendant about 10:20 a.m. concerning what happened to her husband and continued this interrogation for about 20 minutes before he gave her the constitutional warnings to which she was entitled under the Miranda case. With reference to the homicide, of which he said he believed her to be a suspect, and obviously the only suspect at that time, he asked her 10 or 12 times what had happened. Defendant did not answer his questions. Later, during the hearing, defendant testified that she knew she was being accused of killing her husband, that she knew she was being detained, that she knew she was being held for killing her husband, and that she requested the presence of her lawyer because of this knowledge.
After the 10 or 12 questions with reference to the homicide, Lt. Kuzia asked her several times what was wrong with her hand and then she finally answered. This was followed by several questions as to how the hand injury happened and she ultimately answered him. Thereupon Lt. Kuzia gave her the Mir-anda warnings.
Lt. Kuzia’s testimony was as follows:
“ A # * * We both walked into the living room area. I asked her what happened several times. I got no answer. We sat down. I asked her in substance if she could tell me what happened here. I got no answer several times, and I then asked if she would like me to make some coffee and Mrs. Paulin then told Michael to make the coffee. We sat there for a while and repeatedly I asked her if she could tell me what happened. Again no answers. We had some coffee eventually, smoked some cigarettes, and as we sat there I noticed Mrs. Paulin had a bandage on her left hand. I asked what had happened, what was wrong with her hand again several times, again no answer, and finally she said, ‘ My husband cut it, ’ and I asked how that had happened and again I asked it several times and got no answer and then finally she said, ‘ We had an awful fight, an awful fight. ’ ’ ’
Then, according to the testimony of Lt. Kuzia, for the first time, he advised her of her constitutional rights and gave her the Miranda warnings.
While defendant was in her own home, and it may be considered factually similar to People v. Rodney P. (Anonymous) (21 N Y 2d 1), the situation herein was far from identical, and, *294 in the opinion of this court is clearly distinguishable. Upon the whole evidence given at the day and one-half hearing, the atmosphere of her residence was overwhelmingly police-dominated. From the moment Lt. Kuzia first saw defendant until she was conveyed by two (2) State Police Investigators and an acting police matron in a State police patrol car to the Malta police station for booking, she was constantly and closely accompanied by one, two or more police officers or department female employee, even to entering the bathroom with her. The number of police personnel in and about the house, garage and yard rose to 12 or 13 from 10:00 a.m. to sometime after 1:30 p.m.
As to the time for giving the required warnings required by Miranda, whether the former standard as the rule was understood to be on June 12, 1967, i.e., when the officer knew she was “ not free to go ” if she failed to answer a question, or the later modification of the standard expressed in People v. Rodney P. (Anonymous) (21 N Y 2d 1, 9) as “ whether the subject * * * is placed in a situation in which he reasonably believes that his freedom of action or movement is [significantly] restricted by such interrogation ’ ’, the warnings came too late. This court finds that the above facts establish beyond a reasonable doubt that the defendant was interrogated by a uniformed police officer, that she was significantly detained, that the officer knew that her freedom of action and movement was being restricted in a police-dominated atmosphere by the interrogation, and that she knew and believed the same. The interrogation, under those circumstances and in that atmosphere, particularly by a uniformed high-ranking police officer, is the compulsion barred by the Miranda decision. It is this coercion which deprives the individual of his freedom of choice — to answer or not to answer — which requires that he be clearly and understandingly advised of his constitutional rights and privileges. This court further and specifically finds that the oral answers given by the defendant after a .series of 15 to 18 repetitive questions were, concerning the cut on her hand, the fact that her husband, the victim, cut it, and the statement to the effect that they (she and her husband) had an awful fight, and made by the defendant before the interrogating officer gave her the Miranda warnings, beyond a reasonable doubt, given in response to constitutionally unpermissive, in-custodial interrogation; and, as a matter of law, the questions and answers are inadmissible as evidence at her trial. Defendant’s oral statements to Lt. Kuzia are, therefore, suppressed, and defendant’s motion in this respect is granted. Submit order accordingly.
*295 PAST II
Immediately after the above-quoted testimony, the defendant requested an attorney; as other officers of the State police came, they were promptly instructed upon arrival not to question the defendant. Lt. Kuzia did not question her further, and neither did the officers of lesser rank who received the instruction. By Lt. Kuzia’s efforts, James 'Straney, the attorney named by defendant, was reached via telephone at the courthouse in Albany, N.Y., where he was engaged and could not leave. Attorney talked directly with his client via telephone and she accepted his office associate, Richard D’Allesandro, as counsel. About 10 minutes later Attorney D ’Allesandro telephoned, spoke to Lt. Kuzia, and reported that he would come right up to the defendant’s residence.
At this time, defendant was not overtly accused of the homicide ; she was not placed in physical restraint; and she was not placed in formal police arrest. These events, as related above, brought the time up to about 11:25 a.m. ; and, apparently between the telephone calls to the attorneys for the defendant, Captain Saverio A. Chieco of the New York State Police arrived, having been taken off leave and also dispatched to the site by Captain James Smith of company headquarters. It is also noted that, per the minutes of the preliminary hearing, William Werner, M.D., one of the Coroners in Saratoga County, arrived about 11:30 a.m. and proceeded to make his official examination of the body of the victim, Joseph Paulin, which he pronounced dead and directed to arrange an autopsy performed by a pathologist at Ellis Hospital, Schenectady, N. Y.
Lt. Kuzia informed Captain Chieco of the events prior to his arrival, including the belief that Mrs. Paulin might possibly be a suspect, the fact that he, Lt. Kuzia, had given her the Miranda warnings, that the other police officers present had been instructed not to question her since she had requested an attorney, that her attorney had been notified of her request and that an associate attorney from her lawyer’s office was then en route to the Paulin house. Thereafter, the events, as testified by Captain Chieco at the suppression hearing, which testimony was substantially the same as the preliminary hearing, were as follows:
“ Q. What did you do then? “ A. I looked at — into the room, into the living room, I looked around then and there was Mrs. Paulin, at least I believed it was Mrs. Paulin, I had never met Mrs. Paulin. I said to the Lieutenant, ‘ Is that Mrs. Paulin? ’ *296 and he said yes and we walked over towards her and the Lieutenant introduced me to Mrs. Paulin.
“ Q. What did you say? “ A. I sat down next to Mrs. Paulin and I said, ‘ Mrs. Paulin, I know this is a terrible tragedy. ’
“ Q. Prior to that did you have any conversation with her in reference to Lieut. Kuzia’s conversation with her? A. Yes, I said, ‘ I understand the Lieutenant has advised you of all of your rights and you have requested an attorney, is that correct? ’ She said, ‘Yes.’ I said, ‘ Did you understand all of your rights? ’ She said, ‘ Yes.’ I said, ‘ Well, I will repeat the rights for you and to make sure you understand them, ’ and I did repeat them and she said, ‘ I understand. ’ I said, ‘ You know your attorney is coming, right? ’ and she said, ‘ Yes,’ and I said, ‘ As long as you wanted your attorney and as long as he is coming, you understand you shouldn’t say anything? ’ She said, ‘ Yes.’ Then I said, ‘ Well, you know this is — as bad as this thing is, there are certain things that have to be taken care of. We have to think of the body — funeral. Do you have any thoughts about an undertaker who you would want to handle this? ’ and she looked at me and she didn’t answer that and then she said, ‘ I want you to know it wasn’t my fault, ’ and I said, ‘ Well, you know your lawyer is coming and you know he is on his way and you wanted him to come, ’ and warned her as long as he was coming she shouldn’t say anything, and she said, ‘ Yes, but I want you to know how it was; it wasn’t my fault.’ She said, ‘ I couldn’t help it. What did you expect me to do? ’ and from this point on she just kept talking. I don’t think anything could have stopped her.
“ Q. What did she say, Inspector? A. She wanted to tell me what it was that happened and she said that they had had violent arguments for years and that he hit her a lot and that Thursday night they had an argument and she couldn’t take it any more and he had cut her hand and she had killed him while he was in the bed sleeping, she had gotten a kitchen pot and hit him on the head several times as hard as she could.
“ Q. Up to this point had you asked her any questions? A. No sir.
“ Q. All right, continue. A. She got this all out and I again told her her lawyer was en route, reminded her that her lawyer was en route, she said, ‘ I know. ’ I said, ‘ Are you sure you understand all your rights ? I know all these years you are married to a Trooper you are probably familiar with the law but are you sure of your rights? ’ She said, ‘ Yes, I know, I know. ’ Then I did ask her a question, I .said, ‘ Will you, would you mind showing me the pot? ’ and she said, ‘ I will show it to *297 you,’ and she led the way to the kitchen, pulled out one of the drawers and she showed me a particular pot. ’ ’
These are the oral admissions, statements and confession defendant also seeks to suppress by one of her motions. This court is of the opinion defendant should prevail. In the Miranda case (384 U. S., at pp. 473-474), after a showing that he intends to exercise his Fifth Amendment privilege, (1) “ the interrogation must cease.” (Emphasis added.) “Any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.” (2) “If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning.”
I find that by her failure to answer some 10 or 12 questions asked her by Lt. Kuzia as to how the homicide happened, of which Captain Chieco was aware, was, beyond a reasonable doubt, an exercise of her Fifth Amendment privilege and right to remain silent; that after the Miranda warnings were first given, her rights were honored; and the duty of the police officers not to invade and violate her constitutional rights were respected until the foregoing dialogue was initiated by Captain Chieco. As well as her failure to answer, her affirmative request for an attorney is a further basis for finding that she had claimed her privileges. He was bound by this claim of privilege even without direct advice thereof under People v. Dunleavy (26 A D 2d 649), where a confession was excluded which had been taken by one officer who was unaware that accused had claimed privilege previously to another officer.
I further find beyond a reasonable doubt that the defendant affirmatively stated her request to have her attorney present and had thus exercised her privilege under the Sixth Amendment; that Captain Chieco knew this and was bound by it. In addition to the Miranda case prohibition, in-custody statements taken in the absence of counsel must be excluded under the spirit of People v. Donovan (13 N Y 2d 148), and the pronouncements of our New York appellate courts in People v. Gunner (15 N Y 2d 226); People v. Sanchez (15 N Y 2d 387); People v. Ressler (17 N Y 2d 174); People v. Lacy (25 A D 2d 788); People v. Harper (27 A D 2d 736); People v. Noble (9 N Y 2d 571) and Escobedo v. Illinois (378 U. S. 478); unless a finding can be made that the defendant waived the privilege after exercising the claim and before making an admission, statement or confession, which has not been contended by the People herein; or *298 that the alleged statement in issue was volunteered by the defendant without interrogation, which is the contention relied upon by the People.
Briefly, in passing, the record, beyond a reasonable doubt, is devoid of any evidence of waiver. Once the privileges have been exercised under the rights guaranteed by the United States Constitution, the Miranda decision, quoting from Escobedo v. Illinois (supra) reiterates the heavy burden on the prosecution to prove waiver of constitutional rights, and requires it to show that a defendant voluntarily, competently, knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel. The Miranda case also states (p. 475 that an express affirmative statement “ that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver wil'1 not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.” The United States Supreme Court in Carnley v. Cochran (369 U. S. 506, 516) said: “ Presuming waiver from a silent record is impermissible. The record must show * * * that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.” (Emphasis added.) Note that these principles apply where there is an asserted waiver after the warnings.' In the instant motion, there is the added factor that the defendant affirmatively claimed her privileges. The burden of the People to eliminate this added factor before a statement or confession can be taken must be and is even greater. Herein the testimony of Captain Chieco above quoted leading up to the alleged confession fails beyond a reasonable doubt to carry this burden of proof. (See United States v. Nielsen, 292 F. 2d 849.)
While the Miranda case, once the privileges have been claimed, uses the phrase, ‘1 interrogation must cease”, it also adds (p. 474): “If * * * he indicates that he wants one [an attorney] before speaking to police, they must respect his decision to remain silent.” The Manual for Police, prepared and published by the New York State Police, in section 78 — investigations — r on the topic, Subject Refusing Interview or Desiring cm Attorney pointedly avoids using the word, ‘ ‘ interrogation ’ ’ and states: “ If the subject at any time during 1 custodial interrogation ’ indicates in any manner that he does not wish to talk or that he wishes to consult an attorney, the interview cannot lawfully be conducted. If already in progress it must be *299 stopped.” (Emphasis added.) At the hearing, the District Attorney clearly and emphatically stated that the Manual is not the law. However, it is the instructions to members of the State Police force for conducting criminal investigations, prepared by their supervisors based upon their interpretation of the law.
In its main brief, the People rely mainly, almost exclusively, upon People v. Torres (21 N Y 2d 49) as decisional authority that defendant’s utterances were volunteered. The factual situation therein is clearly distinguishable. In Torres the police officer came to the defendant’s residence and explained the meaning of the search warrant which he displayed. The defendant then volunteered an oral statement, which was held to be admissible. The defendant therein was concededly in custody, but there was absolutely no interrogation. In the instant case there was extensive interrogation by Lt. Kuzia, and the crux of the issue now reached herein is on whether or not the dialogue initiated with the defendant by Capt. Chieco was an interrogation under the Miranda case and cases which followed.
Neither, in the opinion of this court, do the supplementary citations submitted control on the factual situation herein. In People v. Baker (28 A D 2d 24), the defendant had conferred with his own attorney; had been advised by him; had engaged in a no-answers interrogation in the presence of his attorney; and later, after his attorney had left, because of an outside factor, changed his mind according to the appellate opinion, and talked. Baker’s statements were held (3:2) to be admissible and not to be the result of impermissible interrogation under Miranda, since the defendant is the final arbiter of his defense. People v. Allen (28 A D 2d 724) may be considered factually similar but there was no police-dominated atmosphere to constitute compulsion and neither had there been an overt assertion of his constitutional rights by Allen, and is therefore not controlling herein.
A “volunteered” confession is not the product of an interrogation at all. Had the defendant herein not claimed her right to remain silent and to have her attorney present, the conversation initiated and pressed by the Captain in this police-dominated atmosphere and at the particular time herein would, have constituted impermissible interrogation. It is not necessary that the sentences terminate with rising inflections and require question marks as punctuation in the transcription. It is the over-all effect which must be scrutinized to determine the interviewer’s intent and goal. Under the circumstances, the technically non- *300 interrogatory phrases; “ this is a terrible tragedy ”, “ as bad as this is ”, “ think of the body ”,• — “ funeral ”, “ Do you have any thoughts about an undertaker to handle it? ” are inherently, implieity, and indirectly the type of psychological pressures made unlawful and ordered eliminated by Miranda. The law has gone far beyond the holdings prohibiting physical coercion and so-called third degree tactics. ‘ ‘ The blood of the accused is not the only hallmark of an unconstitutional inquisition.” (Blackburn v. Alabama, 361 U. S. 199, 206.) This was not “ routine ” and ‘1 casual ’ ’ nonincriminating questioning.
The explanation in the Captain’s testimony, coming as it did after all other police officers on the scene had been instructed to, and did, not invade her asserted constitutional rights, was a weak, transparent excuse for his constitutionally unlawful embarkation on the interview, rather than a legally acceptable reason for it. Speaking to her about the obviously ultimate need of an undertaker for proper care and disposition of the body, which, according to all the witnesses, after some three days of decomposition, was already adding to the atmosphere, was not necessary at that moment and was not in proper pursuit of his duties. He had another motive, and though illegal, was successful. At the time he initiated the dialogue, he knew that she at least was a possible suspect who had overtly claimed her rights, that the attorney she requested was en route and minutes away, that from his own testimony, she was distraught, subnormal physically, mentally and emotionally, that she was under some form of medication, that the County Coroner was in the next room examining the body, that under department policy it was necessary that an autopsy would follow. There was plenty of time for her attorney, a relative, or friend, to attend to the civil function of funeral arrangements, as would normally be done.
I find that, beyond a reasonable doubt, the alleged confession, admissions and statements against interest of defendant in the interview or dialogue initiated and conducted by Captain Saverio A. Chieco, and herein quoted, were elicited from her by an unlawful and illegal invasion of her overtly claimed privileges, were extracted in a constitutionally impermissive interview, and are doubly inadmissible as a matter of law, against her at trial, under both the Fifth and Sixth Amendments of the United States Constitution. All of the oral statements of defendant to Captain Saverio A. Chieco are, therefore, suppressed as evidence as a matter of law, and defendant’s motion under section 8T3-g of the Code of Criminal Procedure in this respect is granted. Submit order accordingly.
*301 PART in
In defendant’s motion under section 813-c of the Code of Criminal Procedure to suppress the afore-mentioned cooking pot as an instrumentality of the crime, the People contend it was seized by consent. This cannot be held. The act of “ consent ” relied upon is an integral part of the constitutionally illegal statement of the defendant suppressed herein in Part IÍ. As succinctly stated in People v. Reason (52 Misc 2d 425, 431) “As a general proposition, if fruits of a crime or contraband are revealed as a result of unconstitutional police procedures, — in the absence of waiver or ‘ attenuation ’ (dissipation of the primary-taint doctrine of Wong Sun v. United States, 371 U. S. 471, 491), such fruits or contraband must be suppressed as ‘ fruits ’ of the ‘ poisoned tree ’.” This principle is now well founded in our law. (Silverthorne Lbr. Co. v. United States, 251 U. S. 385; Nardone v. United States, 308 U. S. 338; People v. Ressler, 17 N Y 2d 174; People v. Grossman, 45 Misc 2d 557, affd. 20 N Y 2d 344, and other decisions cited therein.) The very identification of the cooking pot, one of the instrumentalities of the crime charged herein, and the location of it, have their only source, at the time of seizure, in the statement of defendant obtained by unlawful police procedures and herein-before suppressed. Therefore, this court finds, beyond a reasonable doubt, that the alleged instrumentality of crime, a metal cooking pot, People’s Exhibit No. 1 received in evidence at the suppression hearing bearing the markings “ H. P.” on the handle and on the side of the pot (being the initials of Identification Officer Hyman Pollack) was illegally seized by the police in an illegal search without a warrant, and, as a matter of law, is inadmissible as evidence against the defendant at her trial, under the Fourth Amendment of the United States Constitution. The cooking pot is, therefore, suppressed as evidence and defendant’s motion under section 813-c of the Code of Criminal Procedure in this respect is granted. Submit order accordingly.
PART IV
Immediately after the seizure of the cooking pot, a neighbor, attorney Smitas, arrived and talked in semi-privacy, admittedly out of audible distance from the police officers, with the defendant. In a matter of minutes, defendant’s counsel, Richard D’Allesandro, arrived, joining defendant and Mr. Smitas in a far corner of the living room. While these three were conferring, Investigator Hyman Pollack, the Identification Officer, *302 advised Captain Chieeo that Dr. William Werner, in conducting his Coroner’s examination, had moved the body and had noted stab wounds. Captain Chieeo looked at the body and saw the stab wounds. He then talked aside privately to the two attorneys, requesting them to have the defendant tell 1‘ what she did with the knife”. While the attorneys conferred on this request, the Captain decided, and so advised the attorneys, that it would be improper for them to assist him in that matter. He then 11 ordered a complete search of all knives and kitchen utensils by Investigator Pollack. I opened the kitchen drawer where the knives were kept and I observed one knife had what appeared to be stains on it. I instructed Investigator Pollack to take the entire drawer of knives and mark the same for identification and to have the knives tested at our lab.” Captain Chieeo then returned to the living room and advised her attorneys and the defendant that she was under arrest for the crime of murder in the first degree. When Investigator Pollack testified at the suppression hearing this knife in issue was identified, described as bearing the mark “ H. P.” (initials of Hyman Pollack, Identification Officer), and was received in evidence as People’s Exhibit No. 2.
By this motion defendant seeks to suppress use of this knife as evidence against her on the ground that it was seized without a warrant or without displaying a warrant in violation of the Fourth Amendment of the United States Constitution and Mapp v. Ohio, 367 U. S. 643 and Wong Sun v. United States, (371 U. S. 471, supra). The People claim the knife is admissible evidence by decisional liberation of the constitutional prohibition against searches without a warrant, under the established principle that “ The property subject to seizure as incidental to a lawful arrest is the same as the property seized under a search warrant.” Thus it appears that the prerequisite conditions for arrest without a warrant and for the issuance of a search warrant become very important to a decision in this factual situation.
The deféndant did not mention a knife or a stabbing in her conversation with the State Police Captain, hereinbefore quoted. Therefore, her statement, if it were admissible, cannot justify the admissibility of the knife as being seized by consent; neither can her statement, being held inadmissible, be said to have tainted, as such, the seizure of the knife. The answer to the question of its admissibility must be sought otherwise.
An arrest without a warrant is lawful when a felony has in fact been committed and the arresting officer has reasonable *303 cause for believing the person to be arrested to have committed it (Code Crim. Pro., § 177, subd. 3). The Fourth Amendment of the United States Constitution, provides that “ No warrants shall issue, but upon probable cause ”. A search, to be valid as incidental to a lawful arrest, must be contemporaneous with the arrest. Most authorities hold the search, being subordinate to and dependent upon the arrest, must come about immediately after the arrest. (People v. Loria, 10 N Y 2d 368; People v. O’Neill, 11 N Y 2d 148; Rios v. United States, 364 U. S. 253, 261-262; Henry v. United States, 361 U. S. 98, 100.) Also, seizure must be valid when it is made. It is not validated by subsequent events. (People v. O’Neill, supra; Johnson v. United States, 333 U. S. 10, 16; United States v. Walker, 246 F. 2d 519, 525; Lee v. United States; 232 F. 2d 354, 355; People v. Brown, 45 Cal. 2d 640, 644.) On the other hand, imminent danger, as from a loaded firearm, might well make such rigidity of the order of events unreasonable. In the instant case, however, a finding on this point is not necessary to the decision.
The findings of the Coroner in his examination could well have been the ‘ ‘ probable cause ’ ’ upon which a Magistrate would issue a search warrant for the knife as an instrumentality of crime. But, in fact, no application was made and there was no search warrant. These findings, the stab wounds on the victim’s body, would not have been “ probable cause ” for the issuance of an arrest warrant directed to this specific defendant. The fact of the stab wounds alone do not point to her. Therefore, they cannot be said to be “ reasonable cause ” for believing she committed the crime and thus justify her arrest without a warrant. In the situation in this case, “ reasonable cause ” for the arrest and “ probable cause ” as a condition for issuance of a search warrant do not equate. At the time of the arrest, I find beyond a reasonable doubt that the only reasonable cause for believing that defendant committed the crime, disclosed by the record and by the testimony at the suppression hearing, was her own oral statement or confession. This has been suppressed as being unlawfully elicited from her and cannot be the lawful basis of an arrest which would justify an incidental search, regardless of the order in which they occurred. I further specifically find beyond a reasonable doubt that for the purpose of justifying the alleged incidental search, the arrest was not lawful, that the seizure of the knife was illegal as to this defendant, and it is inadmissible, as a matter of law, as evidence against this defendant at her trial, under *304 the Fourth Amendment of the United States Constitution. The knife, as above described and identified, is therefore suppressed, and defendant’s motion under section 813-c of the Code of Criminal Procedure in this respect is granted. Submit order accordingly.
part v
By stipulation, certain articles of bed clothing, towels and pajamas, seized by the State Police at the residence and at the hospital after the autopsy, are included in the motion to suppress under section 813-c of the Code of Criminal Procedure. As to those items of evidence, defendant’s motion is denied. This court finds beyond a reasonable doubt that they were not mentioned by defendant in her alleged confession heretofore suppressed and they have not thereby become tainted as evidence against her, nor as lead-in evidence at her trial; that they were openly observed without anything in the record to show that the police officers were trespassing; and that they were not the product of any search. This court finds, beyond a reasonable doubt, that they are admissible as evidence at defendant’s trial as a matter of law, and should not be suppressed.
CONCLUDING DIRECTIONS
Pursuant to established authority in New York State, the pretrial judicial determinations on the admissibility of evidence should not be disclosed to the jury. (People v. La Belle, 44 Misc 2d 324, 326; 44 Misc 2d 327, 330; People v. Marturano, 24 A D 2d 733; People v. Pratt, 27 A D 2d 199, 202; People v. Hulett, 28 A D 2d 624.) To be effective, this must include prospective jurors, which at this time include all'members of the general public in Saratoga County who are eligible for jury duty. This decision and any orders made and entered pursuant to it shall not be published or in any way released until there is a determination of the trial or until further order of a court of competent jurisdiction.
The chief counsel for the People and the chief counsel for the defense are hereby directed to advise witnesses called by each to avoid all reference in their testimony at trial to items of evidence which have been suppressed as inadmissible,